**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____
                                                            )
Hector Rodriguez,                                       )
                                                            )          Civil Action No.: 16-cv-5476
                        Plaintiff,                       )
                                                            )          **AMENDED COMPLAINT**
           -Against-                                    )
                                                            )          **JURY TRIAL DEMANDED**
John B. King, Jr. in his capacity as Secretary   )
of the Department of Education; Jack Lew,      )
in his capacity as Secretary of the Department )
of Treasury, Carolyn W. Colvin, in her capacity as )
Commissioner of the Social Security              )
Administration,                                         )
                        Defendants.                    )
_____ )


**PRELIMINARY STATEMENT**


1.      Plaintiff Hector Rodriguez challenges defendants' unlawful practice of offsetting

(reducing) his Social Security disability benefits to collect payment for student loans that the

defendants knew were eligible for a disability-based discharge.

2.      His plight is shared by hundreds of thousands of Social Security disability

recipients whose safety-net benefits are offset for student loan debts that could be discharged if the

defendants simply told them about the existence of the disability-based discharge.

3.      Mr. Rodriguez is a disabled U.S. Army Veteran who was unable to repay his

student loans because his income is limited, consisting solely of Social Security and Veterans

benefits.

4.      Unbeknownst to Mr. Rodriguez, his disability was so severe that he qualified for a

1

student loan disability discharge.   He simply had to request it.   When defendants sent offset notices to Mr. Rodriguez advising him that they were offsetting his Social Security payments, they withheld information about this right.   Instead they referred him to the DOE's debt collector who also withheld this information, even when Mr. Rodriguez called, reported that he was disabled, and asked for help to avoid offset. The debt collector was amply rewarded for withholding the information because it received significantly more compensation from the DOE for getting Mr. Rodriguez into a repayment plan than getting his loan discharged due to a disability.

5.     When Mr. Rodriguez learned of his right to get his loan discharged, his disabilities prevented him from timely obtaining proof that he was disabled.   Consequently, eleven months passed while DOE adjudicated his claim, even though Mr. Rodriguez was eligible for a discharge the day he first tried to obtain proof of his disability.   During this time over $1,300 was slowly drained from his pockets - $1,300 that he desperately needed for basic necessities.

6.     Mr. Rodriguez brings this action seeking declaratory relief, injunctive relief and a return of moneys taken by defendants because of defendants': failure to provide adequate notice of his right to a disability discharge; failure to suspend collection on his loan once notified of his disability; failure to timely find him eligible for a disability discharge; and failure and refusal to use procedures that would have allowed him, given his disability, to fully and timely access the discharge program.

## JURISDICTION

7.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 2201. This Court also has jurisdiction for the Administrative Procedure Act ("APA") claims under 5 U.S.C. § 706, and the Rehabilitation Act claim under 29 U.S.C. § 794.

2

## VENUE

8.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C.

§ 1391(b) inasmuch as a substantial portion of the unlawful practices giving rise to the claims

herein occurred within the Eastern District of New York.

## PARTIES

9.     Mr. Rodriguez is 67 years old and lives at 1255 Pennsylvania Ave. #83, Brooklyn,

NY 11239.

10.     Defendant John B. King, Jr. is the Secretary of the United States Department of

Education, the federal agency of the United States government responsible for administering a

federal student financial aid program, 20 U.S.C. § 1071, et seq., including the Total and Permanent

Disability discharge program.

11.     Defendant Carolyn W. Colvin is the Commissioner of the Social Security

Administration, the agency responsible for administering the Social Security Disability program.

12.     Defendant Jack Lew is the Secretary of the United State Treasury, the agency

responsible for administering the Treasury Offset Program.

## STATUTORY AND DEMOGRAPHIC CONTEXT

### The Department of Education's
### Total and Permanent Disability Discharge Program

13.     Congress mandates that the Secretary of Education discharge (i.e. forgive) a

borrower's federal student loans in various situations. 20 U.S.C. § 1087.

14.     Pursuant to 20 U.S.C. § 1087(a), the Secretary of Education must discharge a

disabled borrower's student loans when the borrower satisfies a statutory definition of "total and

permanent disability" under the Total and Permanent Disability discharge program (hereinafter "disability discharge program").

15.     Procedures for administering the disability discharge program are detailed at 34 C.F.R. § 685.213.   DOE's interpretation of the level of disability needed for discharge eligibility is codified at 34 CFR § 685.102(b).

16.     Under the statute and regulations for the disability discharge program, the Secretary of Education must grant a disability-based discharge if a borrower's disability either has already lasted for a continuous 60-month period or is so severe that it is expected to last for a continuous 60-month period.

17.     In the 2012 amendments to the disability discharge program regulations, set forth at 77 Fed. Reg. 66088, 66092 (November 1, 2012), the Secretary of Education acknowledged that its statutory definition of "total and permanent disability" for purposes of a student loan discharge is "substantially similar" to the standard used by SSA in awarding Social Security disability benefits.

18.     In particular, both the DOE's disability discharge standard and SSA's disability benefits standard define "disability" as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."   DOE acknowledges that both agencies interpret that phrase in the same way.

19.     DOE's standard for a disability-based discharge differs from SSA disability benefits standard only with regard to the duration of the disability.

20.     The DOE discharge is available for individuals who are disabled for a period that has lasted or is expected to last of 60 months, or five years. 20 U.S.C. § 1087(a), 34 CFR § 685.102(b).

21.     The SSA disability payment is payable to individuals who are disabled for a period that has lasted or is expected to last for 12 months. 42 U.S.C. § 423(d); 20 C.F.R. § 416.905.

22.     Accordingly, the receipt of Social Security disability payments is not per se proof that a borrower is eligible for a student loan disability discharge.

23.     Consequently, most borrowers, including Social Security disability recipients, will only prove eligibility by having a doctor complete a DOE questionnaire in which the doctor certifies that their disability has or will last for 60 continuous months.

24.     The one exception to this rule involves "permanently impaired" SSA disability recipients. SSA is required by law to medically review all of its disability recipients (currently 8.9 million) to ensure each one remains disabled and thus eligible for a payment. This is a large task that requires triaging. For those with "permanent impairments," Social Security schedules reviews once every five to seven years.   20 CFR §§ 404.1590(d) and § 416.990(d).

25.     Because DOE recognizes the substantial similarity in the eligibility requirements for a disability-based discharge and for SSA disability benefits, a borrower can use a "permanent impairment" status from SSA to qualify for DOE's student loan disability discharge.

26.     According to a 2016 press announcement by the DOE, almost 400,000 borrowers of student loans are classified by the SSA as permanently impaired and thus eligible for a student loan disability discharge.

27.     On information and belief, most Social Security disability recipients do not know what medical review classification the SSA has assigned their disability.   If a borrower wants to use SSA's classification as proof of eligibility for a student loan disability discharge, he or she must ask SSA for a written statement of the classification and then provide it to the DOE.

28.     Getting such a document from SSA can be challenging. In 2010, one in five visitors to SSA offices in New York left without being served or waited longer than one hour before being served, according to the Social Security Inspector General.   Wait times have since worsened, according to testimony received at a hearing before the Special Committee on the Aging for the U.S. Senate on June 18, 2014.

29.     On information and belief, calling the SSA's 800 number is equally challenging. In 2014, the Wall Street Journal reported that one in seven callers to SSA's 800 number got a busy signal while those who got through were often on hold for an average of 20 minute. Jennifer Waters, "*Calling Social Security? Expect a Wait,*" Wall St. J. June 29, 2014.

30.     A borrower's inability to get information from SSA has consequences.

31.     Under 34 CFR § 685.213(b)(4)(i)(B), the effective date of a disability discharge based on an SSA statement of "permanent impairment" is the date the DOE receives the SSA statement from the borrower, not the date such a designation was made. 34 CFR § 685.213(b)(4)(i)(B).

32.     Under 34 C.F.R. § 685.213(b)(4)(i)(A), the effective date of a disability discharge when a borrower uses a physician certification to apply for a discharge is the date the doctor signs the certification.

33.     Under 34 C.F.R. § 685.213(b)(4)(iii), once the Secretary of Education makes a disability determination, the Secretary is obligated to return to the borrower any student loan payments it collected after the onset date of the borrower's disability.

34.     Consequently, money collected to repay student loans while a borrower is obtaining proof of a permanent disability from the SSA or a doctor will not be returned.

35.     Such harm can be mitigated when the borrower informs the Department of Education that he or she is disabled and that he or she wants to apply for the discharge.   Pursuant to 34 C.F.R. § 685.213(b)(1)(i), the Department of Education must suspend collection activity for up to 120 days when a borrower informs it that he or she is disabled so that the borrower may apply for the discharge.

### Debt Collection Practices for Federal Student Loan Debts

36.     Instead of focusing on getting disabled borrowers the relief they are entitled to under federal law, the Department of Education—working with its loan servicers and debt collectors—uses federal debt collection tools such as the offset of SSA disability benefits to collect money from disabled borrowers.

37.     Student loan debt collection is primarily executed by DOE's servicers and private debt collectors, including debt collection law firms.

38.     SSA benefits, including disability benefits, are generally exempt from private debt collection to protect the important social welfare and poverty reduction purposes of those programs. 42 U.S.C. § 407a.

39.     However, defaulted student loan debts can lead to an offset from Social Security disability benefits through the Treasury Offset Program ("TOP").

40.     TOP is an inter-agency program overseen by the Department of Treasury. TOP is designed to collect federal debts that are due to a creditor agency, such as DOE, by offsetting distributions made by another federal agency, such as SSA disability benefits.

41.     Under the disability discharge statute, 20 U.S.C. § 1087, and pursuant to the DOE's discretionary authority, 31 U.S.C. § 3711, DOE may compromise or suspend or discontinue collection on debts of disabled borrowers.

42.     If DOE elects not to compromise, suspend, or discontinue collection activity for a borrower and DOE is unable to collect on a loan account through the usual debt collection tactics, DOE may refer that borrower's federal student loans for collection through TOP pursuant to 31 U.S.C. § 3716(a).

43.     The collection of student loan debts through Treasury offsets of SSA disability benefits requires notice and due process. 31 U.S.C. § 3716(a).

44.     On information and belief, DOE issues a "Notice of Intent to Offset" to borrowers who are at risk of losing SSA disability benefits through TOP. However, this notice does not inform disabled borrowers of their ability to preserve basic SSA income through DOE's disability discharge. Rather, it advises the borrower of his right to: pay the debt in full; review debt records; demonstrate why the debt is not in default or is not enforceable; and avoid offset by arranging a repayment plan.

45.     After providing the above notice, DOE then sends a student loan debt for TOP collection to Treasury. Treasury matches the identity of the borrower with the distribution of any federal benefits that are subject to TOP collection.   If the borrower receives Social Security disability benefits, Treasury will match DOE as the creditor agency with SSA as the agency whose payments will be offset.

46.     When a borrower's disability benefits are offset to pay for a student loan debt, Treasury sends a notice to the borrower identifying SSA as the "payee agency" and DOE, or its collectors, as the "collector agency."

47.     The TOP offset notice does not provide any information about a disabled borrower's right to protect disability benefits from offset by applying for a disability discharge.

48.     In the case of student loan debt collection, the TOP offset notice often does not contain any reference to the DOE.   Instead, the statement merely identifies a private collection agency hired by the DOE as the "collector agency."

49.     The TOP offset notice sent to an SSA disability recipient directs the disability recipient to contact the private collector for the DOE and not SSA to contest future offsets.

50.     On information and belief, DOE's collection agencies rarely provide disabled borrowers with information about the disability discharge program.

51.     On information and belief, the Department of Education's compensation scheme in early 2014 provided strong incentives for collectors to force disabled borrowers into coercive payment plans and to withhold information about the statutory right to a disability-based discharge of student loan debt.   In 2014, a collector earned only $150 for referring a borrower for a disability discharge, as opposed to earning 16% of any money that a borrower paid through a collection plan. National Consumer Law Center, *Pounding Student Loan Borrowers*, at 11 (Sept. 2014), available at https://www.nclc.org/images/pdf/pr-reports/report-sl-debt-collectors.pdf.

**Over 170,000 Social Security recipients, most of whom are disabled and poor, have their benefits offset for student loan debts each year.**

52.     On information and belief, many disabled Social Security disability recipients lose a portion of their basic income through the TOP program because they do not receive notice that they can protect their income through a statutory right to a disability-based discharge of student loans.

53.     A recent response to a Freedom of Information Request and a GAO report show Social Security offsets for student loans are increasing - from 31,000 in 2002 to 172,000 in 2015. General Accounting Office, Testimony before the Special Committee of Aging, U.S. Senate, *Older Americans:  Inability to Repay Student Loans May Affect Financial Security of a Small Percentage of Retirees*, 17-18 (Sept. 10, 2014) available at http://www.gao.gov/assets/670/665709.pdf.

54.      The majority of borrowers whose Social Security is offset for student loan debt are disability recipients, not retirees. *Id*. at 18.

55.     Moreover, the majority of Social Security recipients who experience offset are low-income persons who need all of their benefits to meet basic needs. The General Accounting Office found that 68% of Social Security recipients whose benefits were offset for student loans received less than $1071 in Social Security benefits *prior to the offset*.   With the offset, they were living even closer to or further below the poverty line. Id. at 21.

10

### A Large Percentage of Social Security Disability Beneficiaries Satisfy the Department of Education's Disability Discharge Standard

56.     In 2016, the Department of Education matched its records of student loan borrowers against SSA's roll of disability recipients who had a "permanent impairment" and were therefore qualified to receive a disability discharge,

57.     387,000 Social Security disability recipients were identified through this matching process.   None of them had obtained a disability discharge and 179,000 were in default and thus subject to offset.

58.     This match was designed to capture only SSA disability recipients who have a "permanent impairment" and are scheduled for review on a five to seven year period.   However, many more Social Security recipients who owe student loans are eligible for a disability discharge.

59.     The majority of Social Security disability recipients satisfy the statutory standard of eligibility for a student loan discharge because they have received disability benefits for more than 60 consecutive months (five years).   Indeed, recent SSA studies show that more than 85% of Social Security recipients remain continuously eligible for disability benefits for ten consecutive years. Sui Liu and David Stapleton, Center for Studying Disability Policy, *How Many SSDI Beneficiaries Leave the Rolls For Work*? (April 2010) available at  https://www.ssa.gov/disabilityresearch/documents/TTW5_Brief_2_DIcohort_REV2.pdf ; SSA Office of Inspector General, *The Social Security Administration's Ability to Detect Disability Fraud*, at 39 (Sept. 2014) available at https://oig.ssa.gov/sites/default/files/testimony/SSA's%20Ability%20to%20Prevent%20and%20Detect%20Disability%20Fraud_0.pdf.

## FACTS RELATING TO PLAINTIFF HECTOR RODRIGUEZ

### Mr. Rodriguez's Disability and Student Loan Debt

60.     Hector Rodriguez is a disabled U.S. Army Veteran.

61.     In the 1970's Mr. Rodriguez obtained federal student loans to attend Kingsborough Community College and Marist College.   However, he was never able to earn a degree due to frequent hospitalizations related to his disability.

62.     In 1973, he was diagnosed with Schizophrenia for which he was psychiatrically hospitalized for more than a month.

63.     Mr. Rodriguez applied successfully for Social Security disability benefits in or around 1973.   Due to his psychiatric illness, he has continuously relied on social security benefits as his source of income to meet basic needs from 1973 to the present.

64.     From 1973 to the present, Mr. Rodriguez has been continuously qualified for SSA disability benefits.   Under the DOE regulations described above, this extended period of eligibility for SSA's disability benefits demonstrated eligibility for DOE's disability discharge program.

65.     No later than March 1, 2011, Mr. Rodriguez's condition was so severe that SSA assigned him a "permanent impairment" designation and scheduled him for medical review every five to seven years.

66.     Mr. Rodriguez did not become aware of this permanent impairment designation until November 2014, many months after his Social Security check had been offset to collect his defaulted student loan.

12

67.     On information and belief, Mr. Rodriguez continuously received Social Security disability benefits until September 2015, when he turned 66 and his Social Security disability benefits were automatically converted to Social Security retirement benefits without regard for his medical status.

**Federal Collection Activity on Mr. Rodriguez's Student Loan Debt**

68.     After being severely disabled and relying on Social Security disability benefits to meet his basic needs for 26 years, Mr. Rodriguez was sued in 1999 in this court under the caption *United States of America v. Hector Rodriguez*, for failure to repay his student loans.

69.     In that action to collect student loan debt, the United States was represented by a private debt-collection law firm, Mullen & Iannarone.

70.     On information and belief, Mullen & Iannarone is one of several Private Collection Agencies ("PCA") that contracts with the Secretary of Education to collect defaulted student loans.

71.     On or about October 3, 2013, Mr. Rodriguez received a letter from DOE's debt collectors bearing the words in bold: "**Notice of Intent to Offset**."   This notice stated that he owed $3,467 and that his Social Security disability benefits would be offset.

72.     The letter failed to inform Mr. Rodriquez that DOE was collecting on a student loan debt. It also failed to inform him that he could preserve his subsistence income and suspend collection activity if he applied for and received a DOE disability discharge.

73.     The letter directed Mr. Rodriguez to contact DOE's debt collectors if he had questions or concerns.

13

74.     On or about January 3, 2014, he received another letter from the Department of Treasury (hereinafter "Treasury Pre-Offset Notice").   It warned "Your Social Security Payment May be Reduced."   The letter further stated that Mr. Rodriguez's SSA disability benefits would be reduced by 15% starting March 2014 and each month thereafter "unless you contact the following agency and meet their requirements to stop the monthly reductions."

75.     The agency contact information on the Treasury Pre-Offset Notice directed Mr. Rodriguez to contact DOE's debt collectors if he wanted to stop the monthly offsets to his disability benefits.

76.     The Treasury Pre-Offset Notice also directed Mr. Rodriguez not to contact either Treasury or SSA with "your questions on about [this] debt."

77.     The Treasury Pre-Offset Notice did not inform Mr. Rodriguez that his SSA disability benefits would be protected if he applied for DOE's disability discharge program.

78.     The following month, he received a nearly identical Treasury Pre-Offset Notice dated February 3, 2014.

79.     Mr. Rodriguez became distraught at the prospect of losing 15% of his Social Security payment. His budget was very tight. He received only $1180 from Social Security and $300 from the VA due to his disabilities.

80.     Not knowing what to do, Mr. Rodriguez reached out to the Veterans Administration ("VA") and consulted with a VA social worker who reviewed the letters and advised Mr. Rodriguez to call DOE's debt collectors.

81.     On or about February 28, 2014, Mr. Rodriguez called DOE's debt collectors. He identified himself as a disabled veteran who relied on Social Security disability benefits and VA benefits to meet his basic needs.

82.     Mr. Rodriguez described the financial hardship that an offset of his benefits would cause him.

83.     He asked the collector if there was anything he could do to prevent his income from being reduced.

84.     Although he did not use the words "accommodation," Mr. Rodriguez asked the collector to accommodate his disability so that he could participate in any of the applicable discharge programs available to borrowers.

85.     The DOE's debt collector told Mr. Rodriguez that the only way he could stop the offset of his disability benefits was if he entered a payment plan and paid DOE $100 each month. The collector also advised Mr. Rodriguez that he would need to find his own lawyer if he wanted to challenge the offset of his disability benefits.

86.     DOE's collector acted contrary to the disability discharge regulations when it withheld information about the disability discharge program even after Mr. Rodriquez explicitly asked about disability-based relief.

87.     DOE's collector did not advise Mr. Rodriguez that he might be eligible for a discharge if the SSA designated him "permanently disabled."

88.     DOE's collector did not offer to contact the SSA to determine whether the SSA designated him as permanently impaired and thus eligible for a disability based discharge of his student loans.

89.    DOE's collector did not suspend collections activity to give him an opportunity to apply for a disability discharge.

90.    Mr. Rodriguez did not enter a payment plan at that time.

91.    Then, on or about March 3, 2014, Mr. Rodriguez's Social Security disability income was offset.   His payment of $1,184 was offset by $177.60, reducing his income by 15%.

92.    Mr. Rodriguez received an additional notice from the Department of Treasury which confirmed the deduction (hereinafter "Treasury Post-Offset Notice").   The Post-Offset Notice directed him to contact the same DOE debt collector if he had questions about the debt. It also specifically told him not to contact SSA.

93.    Treasury's Post-Offset Notice did not explain that the offset could be stopped based on Mr. Rodriguez's disability. The notice also did not explain that the offset should be suspended if he notified the DOE that he wanted to apply for a disability discharge.

94.    Unable to meet basic expenses with his post-offset income, Mr. Rodriguez signed an agreement in March 2014 to pay DOE $100 each month to stop the offset of his social security disability benefits. The DOE collector explicitly warned that the offset would resume if he did not pay on time but still did not mention the disability discharge program.

95.    Consequently, DOE collected six payments of $100 each from Mr. Rodriguez from May 2014 to November 2014.

96.    Mr. Rodriguez also sought assistance from Brooklyn Legal Services in late May 2014.   At that point, he finally learned that he could apply for a disability discharge due to his psychiatric condition.

97.    Mr. Rodriguez also learned of the two ways to document eligibility for a disability

discharge.   At this point, he was still unaware that the SSA had designated him permanently impaired and thus immediately eligible for a disability discharge that would stop collection activity.

98.     However, Mr. Rodriguez's disability (schizophrenia) made it difficult for him to travel to and wait within an SSA office, and then to interact with SSA workers with whom he had no relationship.   Indeed, his doctor would later write that his psychiatric symptoms included auditory hallucinations, isolation, avoidance of others, and interpersonal conflicts.

99.     Mr. Rodriguez' disability did not prevent him from going to his doctors at the VA who knew him and his illnesses, and who generally saw him within a few minutes of his scheduled appointments so as minimize waiting time that made him uncomfortable.

100.    Consequently, Mr. Rodriguez asked his doctor at his next appointment in mid-June, 2014, to complete DOE's one page "Physician's Certification of Disability."

101.    Unfortunately, the first VA doctor he saw was unwilling to complete the form because the VA doctor was an internist, not a psychiatrist.   Mr. Rodriguez did not learn of this until sometime in July 2014.

102.    Thereafter, Mr. Rodriguez saw his psychiatrist several times during the summer of 2014 during which time he waited for the form to be completed. While waiting, he continued to pay $100 each month to DOE's collectors to avoid the offset of his Social Security disability payments.

103.    Finally, on October 16, 2014, the psychiatrist completed the DOE's form and confirmed Mr. Rodriguez's eligibility for a disability-based discharge of his student loans.

104.    The completed disability discharge application was then submitted to DOE on October 22, 2014.

105.    On information and belief, DOE rejected the application because Mr. Rodriguez's Social Security number was miscopied on one of the four entries where that number appeared within the application form.

106.    On information and belief, DOE did not inform Mr. Rodriguez of the Social Security number discrepancy but instead sent a form letter, dated November 5, 2014, thanking him for inquiring about applying for a discharge and advising him he needed to file an application.

107.    The November 5, 2014 letter included a blank questionnaire for his doctor to complete. It also stated that in the alternative he could submit a letter from SSA showing his medical review was once every 5 to 7 years because of a permanent impairment.

108.    Frustrated, Mr. Rodriguez took the notice to Social Security on November 18, 2014.  There, he obtained a written statement from the SSA that his review period was seven years due to a permanent impairment and his next review would not occur until March 2018.

109.    While he was able to get the SSA statement, doing so was difficult due to his psychiatric condition.   The SSA office was crowded and he thought people were looking at him with bad thoughts.   He had to wait about an hour, during which time he repeatedly left the office to calm his nerves and to get away from the other people waiting to be seen by SSA workers.

110.    On November 18, 2014, he faxed the November 5, 2014 letter from DOE with the SSA "permanent impairment" letter to his legal service advocate.   Mr. Rodriguez and his legal service advocate then called DOE on November 19, 2014.   DOE explained that it had the October 16, 2014 psychiatrist certification, but there was some confusion about Mr. Rodriguez's Social

Security number.   DOE's representative directed Mr. Rodriguez to send proof of his Social Security number after which it would process the application. Mr. Rodriguez faxed the proof that same day.

111.    Believing his loan was going to be discharged, Mr. Rodriguez stopped making payments of $100 to DOE on or around December 1, 2014.

112.    DOE waited five months from receipt of the corrected Social Security number on November 19, 2014 before ruling on Mr. Rodriguez's disability discharge application.

113.    On April 22, 2015, DOE sent Mr. Rodriguez a letter finding him disabled as of April 22, 2015. It discharged his debt as of April 22, 2015, even though Mr. Rodriguez's psychiatrist found him disabled and eligible for a discharge on October 16, 2014.

114.    Despite the discharge of his student loan debt as of April 22, 2014, Mr. Rodriguez's disability benefits were offset again in May 2015 and June 2015.

115.    For each of those months, his total monthly income was reduced by $164.85 from $1,099 to $934.15.

116.    On information and belief, these moneys were never returned.

117.    On information and belief, from the time that DOE issued its October 3, 2013 Notice of Intent to Offset through the date of the final offset in June 2015, Mr. Rodriguez was eligible for a student loan disability discharge due to his receipt of Social Security disability benefits for more than five years.   He was also eligible for a DOE disability discharge because, according to an SSA finding, he was permanently impaired.

19

## CLAIMS FOR RELIEF

### FIRST CLAIM

### VIOLATION OF DUE PROCESS – CONSTITUIONALLY INADEQUATE NOTICE

118.    Plaintiff reasserts and realleges the above paragraphs and adds the following to assert a violation of due process under the Fifth Amendment to the United States Constitution.

119.    Sections 702 and 706(2)(b) of the Administrative Procedure Act provide federal court review of the constitutionality of the notices sent to Mr. Rodriguez when Defendants prepared to and then offset Mr. Rodriguez's Social Security disability benefits.

120.    Mr. Rodriguez has a property interest in unfettered access to the full amount of Social Security disability benefits.

121.    Defendants deprived Mr. Rodriguez of the full amount of his Social Security disability benefits through Treasury offsets without informing Mr. Rodriguez of income-saving relief for which a significant majority of Social Security Disability benefit recipients are eligible: the disability-based student loan discharge.

122.    In his *Notice of Intent to Offset* dated October 3, 2013, Defendant Secretary King of the Department of Education deprived Mr. Rodriguez of due process by failing to inform him that his Social Security disability benefit could be protected from offset if he was disabled and applied for a disability discharge.

123.    In his notices dated January 3, 2014, February 3, 2014, and March 3, 2014, Defendant Secretary Lew of the Department of the Treasury Secretary deprived Mr. Rodriguez of due process by failing to inform him that his Social Security Disability benefit could be protected from offset if he was disabled and applied for a disability discharge.

124.     Defendant Commissioner Colvin of the Social Security Administration deprived Mr. Rodriguez of due process by failing to provide any notice to Mr. Rodriguez that his Social Security Disability benefit could be protected from offset if he was disabled and applied for a disability discharge.

125.     Mr. Rodriguez's interest in protecting his principal source of income was paramount.   Because of Mr. Rodriguez's very limited income, a reduction of his monthly income by between $100 and $177 a month caused him great financial and emotional hardship. In contrast, the burden upon the defendants of adding the necessary information to their existing notices, or in the case of the Commissioner of SSA, of creating such a notice, is minimal.

126.     The notices provided by both DOE and Treasury are constitutionally inadequate not only because they fail to provide any notice of the availability of avoiding the offset but also because their only instruction – directing the Social Security recipient to call the debt collector – dramatically increases the risk that a Social Security recipient will not learn about the disability discharge given the compensation scheme provided to DOE's debt collectors.

127.     Providing notice about disability discharges and contact information for DOE's disability discharge servicer on the face of DOE's and Treasury's notices will provide discharge-eligible borrowers with a meaningful opportunity to preserve their Social Security Disability benefits.

128.     As a result of defendants' violation of due process, Mr. Rodriguez has suffered harm.

129.     Plaintiff seeks only the return of Social Security moneys taken through Defendants' use of the unconstitutional notices.

**SECOND CLAIM**

**THE DECISION OF DEFENDANT KING NOT TO SUSPEND COLLECTION WHEN PLAINTIFF DEMONSTRATED POTENTIAL ELIGIBLITY FOR A DISABILITY DISCHARGE WAS ARBITRARY AND CAPRICIOUS.**

130.    Plaintiff reasserts and realleges the above paragraphs and adds the following to assert a violation under the Administrative Procedure Act.

131.    The Administrative Procedure Act provides federal court review of decisions of the Department of Education that are final and non-discretionary.

132.    The Department of Education's regulations provide that it must suspend collection no more than 120 days when a borrower claims to be totally and permanently disabled so that the borrower may submit a disability discharge application. 34 C.F.R. 685.213(b)(1)(ii).

133.    Mr. Rodriguez indicated that he was permanently disabled when he spoke to the collector on or about February 28, 2014.

134.    The Department of Education, through its agent, did not suspend collection for up to 120 days during which Mr. Rodriguez could apply for a disability discharge.

135.    This was a final, non-discretionary decision that was arbitrary and capricious and which harmed Mr. Rodriguez.

22

## THIRD CLAIM

**THE DECISION OF DEFENDANT KING NOT TO SUSPEND COLLECTION ON OCTOBER 22, 2014 WHEN PLAINTIFF FILED HIS DISABILITY APPLICATION WAS ARBITRARY AND CAPRICIOUS.**

136.    Plaintiff reasserts and realleges the above paragraphs and adds the following to assert a violation of the Administrative Procedures Act.

137.    On October 22, 2014, Mr. Rodriguez submitted a disability discharge application to the Department of Education.

138.    The regulations of the Department of Education provide that once an application is received, collection activity is suspended until a ruling is made on the application. 34 C.F.R. 685.213(b)(3)(i).

139.    Defendant Department of Education did not suspend collection when it received Plaintiff's disability discharge application on October 22, 2014.

140.    Its decision was a final, non-discretionary decision that was arbitrary and capricious and which harmed Mr. Rodriguez.

## FOURTH CLAIM

**THE DEPARTMENT OF EDUCATION'S DECISION TO DISCHARGE MR. RODRIGUEZ'S LOAN AS OF APRIL 22, 2015, NOT THE DATE HIS DOCTOR DESIGNATED HIM TOTALLY AND PERMANENTLY DISABLED ON OCTOBER 16, 2014 WAS ARBITRARY AND CAPRICIOUS.**

141.    Plaintiff reasserts and realleges the above paragraphs and adds the following to assert a violation of the Administrative Procedure Act.

23

142.     Pursuant to its regulations, the Department of Education is required to use the date a doctor certifies a borrower permanently disabled as the onset of the disability discharge.   34 C.F.R. § 685.213(b)(4)(i)(A).

143.     Under 34 C.F.R. § 685.213(b)(4)(iii), once the Secretary of Education makes a disability determination, the Secretary is obligated to return to the borrower any student loan payments it collected after the onset date of the borrower's disability.

144.     Although Mr. Rodriguez's doctor certified his disability on October 16, 2014, the Department of Education found him permanently disabled as of April 22, 2015.

145.     This permanent disability decision was a final, non-discretionary decision that was arbitrary and capricious.

146.     The decision caused Mr. Rodriguez harm because it deprived him of a refund of payments the Department of Education collected from October 16, 2014 to April 22, 2015.

**FIFTH CLAIM**

**THE DEPARTMENT OF EDUCATION'S OFFSET OF SOCIAL SECURITY PAYMENTS IN MAY AND JUNE 2015 AFTER IT DISCHARGED MR. RODRIGUEZ'S LOANS AS OF APRIL 22, 2015 WAS ARBITRARY AND CAPRICIOUS.**

147.     Plaintiff reasserts and realleges the above paragraphs and adds the following to assert a violation of the Administrative Procedure Act.

148.     Under 34 C.F.R. § 685.213(b)(4)(iii), once the Secretary of Education makes a disability determination, the Secretary is obligated to return to the borrower any student loan payments it collected after the onset date of the borrower's disability.

24

149.    Although the Department of Education found Mr. Rodriguez permanently disabled as of April 22, 2015, it offset his Social Security payments in May 2015 and June 2015.

150.    The decision caused Mr. Rodriguez harm.


## SIXTH CLAIM

## VIOLATION OF § 504 OF THE REHABILITATION ACT, 29 U.S.C. § 701 et. seq.

151.    Plaintiff reasserts and realleges the above paragraphs and adds the following to assert a violation of the Rehabilitation Act.

152.    Mr. Rodriguez is a disabled individual as defined by the Rehabilitation Act.

153.    The defendants are all directors of executive agencies of the federal government and therefore must comply with the anti-discrimination provisions of the Rehabilitation Act.

154.    Defendant Department of Education administers a disability discharge program whereby borrowers with permanent disabilities may have their loans forgiven.

155.    To qualify for a disability discharge, a student loan borrower must provide either a certification of disability signed by a physician, or a letter from the Social Security Administration indicating the borrower is rated by SSA as "permanently impaired."

156.    Once a student loan borrower is aware of his or her right to file a disability discharge application, he or she must act swiftly because a disability discharge will not predate either the date of the SSA letter or the date of the physician's disability certification.

157.    Mr. Rodriguez was qualified for a disability discharge of his federal student loans by virtue of his classification by SSA as "permanently impaired" for the seven year period beginning March 1, 2011 through March 1, 2018.

25

158.     Mr. Rodriguez was not aware that SSA had classified him this way.

159.     When Mr. Rodriguez learned of the disability discharge program through his lawyer, his disabilities prevented him from accessing the program in a timely manner in order to enjoy the benefits of a discharge, which included a cessation of collection activity.

160.     Mr. Rodriguez has schizoaffective disorder which causes isolation, avoidance of others, interpersonal conflicts, auditory hallucinations, dysphoria, and anhedonia.   Consequently, he avoids being around people, particularly strangers.

161.     Because of his impairments, Mr. Rodriguez considered obtaining documentation of the SSA classification a far more difficult method, and so he chose to prove his disability by asking his doctors to complete the physician attestation form.     Although his schizoaffective disorder generally makes him uncomfortable around people, he is much more comfortable talking with VA doctors and VA personnel whom he knows than with strangers. Likewise, when he can get an appointment at the VA, he is seen on time and thus does not have to endure long waiting times that make him feel vulnerable.

162.     Mr. Rodriguez did not go to Social Security for a letter because his disability makes waiting at such offices difficult.   He thinks people look at him with bad thoughts.   He has difficulty interacting with government personal with whom he has no relationship.

163.     Because it took many months for his doctors at the VA to complete the disability certification form, Mr. Rodriguez was unable to discharge his student loans via the disability discharge program in a timely manner.

164.    Consequently, he lost hundreds of dollars that the collector coerced from him during a time period that he could have had his loans discharged based on the SSA's classification of his impairments as permanent.

165.    Defendant DOE could have accommodated Mr. Rodriguez by checking with the SSA if his impairment was "permanent" when Mr. Rodriguez asked the DOE's representative not to offset his Social Security due to his disability.

166.    Such an accommodation would not have fundamentally altered the disability discharge program, but instead would have insured Mr. Rodriguez's disability did not exclude him from obtaining a timely discharge of his student loan debt.

167.    Such an accommodation would not be an undue burden.   Indeed, DOE in 2016 created a computer matching program with SSA that identifies student loan borrowers who are permanently impaired and thus eligible for a student loan disability discharges.

168.    As a result of defendants' violations of the Rehabilitation Act, Mr. Rodriguez has suffered harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.      Assume jurisdiction over this matter;

2.      Enter a declaratory judgment that defendants' failure to provide notice to plaintiff of his right to avoid Social Security offset by applying for a student loan disability discharge violates the due process clause of the Fifth Amendment to the United States Constitution;

3.      Enter a declaratory judgment that defendant DOE violated section 504 of the Rehabilitation Act ;

4.      Enter a declaratory judgment that defendant DOE's decisions not to suspend collection of Mr. Rodriquez's debt and to deem him permanently disability as of April 22, 2015 were arbitrary and capricious;

5.      Order defendants to share information with one another so as to identify and not offset Social Security disability benefits of disabled persons designated by SSA as student loan disability discharge eligible.

6.      Order defendants to ensure their offset notices bear information prominently featured on the front page about the availability of a disability discharge and contact information for DOE's disability discharge servicer;

7.      Order Defendants to return all moneys offset or otherwise paid by the Plaintiff towards his student loan from October 2013 through July 2015;

8.      Enjoin defendants from engaging in such illegal conduct in the future in the event Mr. Rodriguez's student loan debt is reinstated because his disability has ceased or he is earning income at a level rendering him ineligibility for a disability discharge;

28

9.    Award attorney's fees and other damages; and

10.    Award such other and further relief as this Court deems just and proper.


Dated:        December 21, 2016
              Brooklyn, New York




              By:    _____/s/_____
                     JOHNSON TYLER
                     DANIEL BARKLEY
                     Of Counsel to Meghan Faux
                     Brooklyn Legal Services
                     105 Court Street
                     Brooklyn, NY 11201
                     Attorneys for Plaintiff
                     (718) 237-5500