**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____ )
Hector Rodriguez, Manuel Roberts, Arma Bailey,  )
Kathy Liriano, John Milas, Claudia Cort,  )
Fermina Soto, Marshall Lee, and Linda Carrasquillo )    Civil Action No.: 16-cv-5476
                                                   )
                  Plaintiffs,                      )    Civil Action No.: 17-cv-1778
                                                   )    Nicholas G. Garaufis, Judge
                                                   )    Ramon E. Reyes, Jr., Magistrate
                                                   )
                                                   )    **FIRST AMENDED**
                                                   )    **CONSOLIDATED COMPLAINT**
          -Against-                                )
                                                   )    **JURY TRIAL DEMANDED**
Betsy DeVos, in her capacity as Secretary          )
of the Department of Education; Steven Mnuchin,    )
in his capacity as Secretary of the Department     )
of Treasury, Jeff Sessions, in his capacity as     )
Attorney General of the United States, and         )
Nancy Berryhill, in her capacity as Acting         )
Commissioner of the Social Security                )
Administration,                                    )
                                                   )
                  Defendants.                      )
_____ )

**PRELIMINARY STATEMENT**

1.       Plaintiffs are Social Security recipients who challenge Defendants' unlawful

practice of offsetting (reducing) their Social Security Disability and Retirement benefits to collect

payment for student loans without providing meaningful notice of their right to avoid offset

through a disability discharge.

2.       The plight of these Plaintiffs is shared by over 100,000 impoverished and disabled

Social Security recipients whose benefits are offset each month for student loan debts that could be

1

discharged if the Defendants simply told them about the existence of the disability-based discharge and provided a more appropriate legal method for evaluating their claims.

3.      Neither the Treasury Department, the Social Security Administration, nor the Department of Justice advise defaulted borrowers who receive Social Security Disability benefits that they can protect these payments from offset by obtaining a student loan disability discharge.

4.      The Department of Education's pre-offset notice appraises a borrower of the disability discharge, but fails to satisfy due process because the notice is given only once, often many years before a borrower's disability and subsequent Social Security offset begin.

5.      Plaintiffs received their first and only pre-offset notice from the Department of Education prior to becoming disabled. Consequently, when these Plaintiffs became disabled many years later and had their Social Security offset, they had no meaningful and timely notice of their right to stop the offset by filing a disability discharge application.

6.      Six of the Plaintiffs also allege that the Defendants violated Section 504 of the Rehabilitation Act by failing to verify their eligibility for a disability discharge status with Defendant SSA.

## JURISDICTION

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 2201. This Court also has jurisdiction over the Administrative Procedure Act ("APA") claims under 5 U.S.C. § 706.

8.      In addition, this Court has jurisdiction over the Rehabilitation Act claims of six of the Plaintiffs under 29 U.S.C. § 794.

2

## VENUE

9.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C.

§ 1391(b) inasmuch as a substantial portion of the unlawful practices giving rise to the claims

herein occurred within the Eastern District of New York.

## PARTIES

10.      Hector Rodriguez is 67 years old. When this action was filed, he lived at 1255

Pennsylvania Avenue, #83, Brooklyn, NY 11239.   He now lives with family in Puerto Rico,

having suffered a massive heart attack while visiting them after this action was filed.

11.      Manuel Roberts is 54 years old and lives at 674 East 32nd Street, #1, Brooklyn NY

11210.

12.      Arma Bailey is 52 years old and lives at 52 Cozine Avenue, #4D, Brooklyn NY

11207.

13.      Kathy Liriano is 49 years old and lives at 1187 Boston Road, #2D, Bronx NY

10456.

14.      John Milas is 56 years old and lives at 2839 West 33rd Street, #9G, Brooklyn, NY

11233.

15.      Claudia Cort is 50 years old and lives at 145 Martense Street, 2 Floor, Brooklyn,

NY 11226.

16.      Fermina Soto is 70 years old and lives at 550 40th Street, # 1C, Brooklyn, NY

11232.

17.      Marshall Lee is 61 years old and lives at 1248 St. Marks Avenue, #4J, Brooklyn

NY 11213.

3

18.     Linda Carrasquillo is 60 years old and lives at 88-16 75th Street, Woodhaven, NY 11421.

19.     Defendant Betsy DeVos is the Secretary of the United States Department of Education, the federal agency of the United States government responsible for administering the federal student financial aid program, 20 U.S.C. § 1071, et seq., including the Total and Permanent Disability ("TPD") discharge program. Defendant DeVos will be referred to hereinafter as "Department of Education" or "Secretary of Education" or "DOE".

20.     Defendant Steven Mnuchin is the Secretary of the United States Treasury, the agency responsible for administering the Treasury Offset Program.   Defendant Mnuchin will be referred to hereinafter as "Treasury."

21.     Defendant Jeff Sessions is the Attorney General for the United States, the head of the Department of Justice which enforces money judgments obtained by the United States Government in federal court. Defendant Session will be referred to hereinafter as "Department of Justice" or "DOJ".

22.     Defendant Nancy Berryhill is the Acting Commissioner of the Social Security Administration, the agency responsible for administering the Social Security Disability program. Defendant Berryhill will be referred to hereinafter as "Social Security Administration" or "SSA."

## STATUTORY AND DEMOGRAPHIC CONTEXT

### The Department of Education's
### Total and Permanent Disability Discharge Program

23.     Congress mandates that the Secretary of Education discharge (i.e. forgive) a borrower's federal student loans under certain circumstances. 20 U.S.C. § 1087.

24.     One of those circumstances is the permanent disability of the borrower. Pursuant to 20 U.S.C. § 1087(a), the Secretary of Education must discharge a disabled borrower's student loans when the borrower satisfies a statutory definition of "total and permanent disability" (TPD).

25.     Under 20 U.S.C. § 1087(a), and the TPD regulations codified at 34 CFR § 685.102(b), the Secretary of Education must grant a disability-based discharge if a borrower's disability either has already lasted for a continuous 60-month period (five years) or is so severe that it is expected to last for a continuous 60-month period or result in death before then.

26.     In the 2012 amendments to the TPD regulations, the Secretary of Education acknowledged that its statutory definition of "total and permanent disability" for purposes of a student loan discharge is "substantially similar" to the standard used by the Social Security Administration in awarding Social Security Disability benefits. 77 FR 66088-01, at *66092, 2012 WL 5354089 (November 1, 2012).

27.     Both the DOE's TPD standard and the SSA's disability benefits standard define "disability" as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."   DOE acknowledged that both agencies interpret that phrase in the same way. *Id*.

28.     DOE's TPD standard differs from the SSA disability benefits standard only with regard to the duration of the disability.   Social Security Disability payments are paid to individuals who are "disabled" for a period that has lasted or is expected to last for 12 months. The DOE discharge is available for individuals who meet the SSA definition of "disability" for 60 consecutive months, or five years. 42 U.S.C. § 423(d); 20 C.F.R. § 416.905.

29.     Pursuant to 34 C.F.R. § 685.213(b)(2), a borrower can use one of two methods to prove eligibility for a total and permanent disability discharge. The methods are set forth in the Department of Education's (DOE's) two paged discharge application.

30.     The first method is to have a physician certify that the borrower is totally and permanently disabled. Included on the DOE TPD application is a one page "Physician's Certification" in which a doctor must provide the borrower's diagnosis and limitations and check-off a box in which he or she certifies that the borrower's disability has prevented or will prevent the borrower from performing substantial gainful activity for five consecutive years.

31.     The second method, which applies only to Social Security Disability recipients, is to provide verification from SSA that SSA reviews the borrower's disability no less than once every 5 years. On the DOE TPD application, a borrower is asked if he or she has "received an SSA notice of award for SSDI [Social Security Disability] or SSI [Supplemental Security Income] benefits or an SSA Benefits Planning Query ("BPQY") stating that your next scheduled disability review will be in 5 to 7 years . . . ."

32.     If the borrower has received such notice, then the borrower may provide that notice with the DOE application in lieu of a physician's certification of disability.

33.     Pursuant to 34 C.F.R. § 685.213(b)(1)(i), when a borrower informs DOE that that he or she intends to apply for a disability discharge, DOE is obligated to suspend collection activity for up to 120 days.

34.     Under 34 C.F.R. § 685.213(b)(4)(i)(A), the effective date of a disability discharge based on a physician certification is the date a doctor signs the physician certification.

35.     Under 34 C.F.R. § 685.213(b)(4)(i)(B), the effective date of a disability discharge based on SSA verification is the date the borrower submits the proof of the five to seven year disability review period to DOE, not the date SSA made the designation.

36.     Under 34 C.F.R. § 685.213(b)(4)(iii), once the Secretary of Education makes a disability determination, the Secretary is obligated to return to the borrower any student loan payments it collected after the effective date of the borrower's disability discharge.

37.     Consequently, Social Security payments that are offset before a borrower knows of his right to apply for a disability discharge, or while a borrower is obtaining proof of a permanent disability from the SSA or a doctor, are not returned.

**Debt Collection Practices for Federal Student Loan Debts**

38.     Instead of focusing on getting disabled borrowers the relief they are entitled to under federal law, the Department of Education—working with its loan servicers, Guaranty Agencies, debt collectors, and the Department of Justice—uses federal debt collection tools such as the offset of SSA disability benefits to collect money from disabled borrowers.

39.     SSA benefits, including disability benefits, are generally exempt from private debt collection to protect the important social welfare and poverty reduction purposes of those programs. 42 U.S.C. § 407a.

40.     However, defaulted student loan debts can lead to an offset from Social Security Disability benefits through the Treasury Offset Program ("TOP").

41.     TOP is an inter-agency program overseen by the Department of Treasury. TOP is designed to collect federal debts that are due to a creditor agency by offsetting distributions made by another federal agency, such as SSA disability benefits.

42.     Two creditor federal agencies, the Department of Education and the Justice Department, refer defaulted student loans to the Treasury Offset Program.

43.     Both DOE and DOJ "must" refer a defaulted loan to Treasury for offset 120 days after the loan has been in default, according to 31 U.S.C.A. § 3716(c)(6)(a), 28 C.F.R. § 11.12(a), and 31 C.F.R. § 285.12(c).

44.     Before either DOE or DOJ refers a defaulted student loan to Treasury for offset, the referring creditor agency must certify to the Treasury that it has provided notice that satisfies due process. 31 U.S.C. § 3716(a); 31 C.F.R. § 285.4(d).

### The DOE and DOJ Pre-Offset Notice

45.     In 1988, DOE issued its current regulations, as set forth at 34 C.F.R. § 30.22(b), regarding what must be included in a pre-offset notice. This regulation was issued when tax refunds could be offset, but not Social Security (which only became subject to offset in 1996 pursuant to the Debt Collection Improvement Act). Therefore, the regulations are silent regarding the right of a person to protect his Social Security Disability payments from offset if she is disabled.

46.     Pursuant to 34 C.F.R. § 30.22(b), DOE's *pre-offset* notice must state: the nature and amount of the debt; the Secretary's intent to collect the debt by offset; and a deadline for the borrower to (a) inspect and copy Department records pertaining to the debt, (b) obtain a review within the Department of the existence or amount of the debt, or (c) enter into a written agreement with the Secretary to repay the debt.

47.     The regulations require DOE to send this notice only once. 34 C.F.R. § 30.22(d).

48.     On information and belief, in 1989 DOE was sued because its pre-offset notice failed to satisfy due process. On information and belief, DOE changed its notice to include discharges defenses to offset, including the disability discharge. DOE made these changes to its notice prior to 1996 legislation that permitted the offset of Social Security payments for student loan debts.

49.     On information and belief, DOE's current pre-offset notice consists of a single paged *Debt Statement*, a double paged *Proposed Treasury Offset Notice*, and a double paged *Request for Review* form. See Exhibit A attached to complaint

50.     DOE's *Proposed Treasury Offset Notice* includes a section entitled "Objections you may raise to collection of the debt." In this section, DOE states the borrower can avoid offset if "the debt is not legally enforceable against you at this time because, for example, . . . the loan was cancelled for the . . . disability of the borrower."

51.     On information and belief, DOE attaches a *Request for Review* form to the *Debt Statement* and *Proposed Treasury Offset Notice*. The current *Request for Review* form bears the form number RFR TOP 2010-191. It provides the borrower with the opportunity to challenge the proposed offset by, among other things, checking a box that states, "I am totally and permanently disabled." The form instructs the borrower to attach a completed TPD application to his or her request for review which the borrower can obtain on the internet.

52.     Because the pre-offset notice is a pre-requisite to referring a defaulted loan to Treasury for offset, DOE has no information at the time the notice is sent whether the borrower receives any federal payments. Accordingly, the notice does not specify what federal payment of the borrower will be offset or when. Instead it merely includes a general statement that all present

9

or future federal payments such as Social Security, federal or state tax refunds, and federal travel expense vouchers are subject to offset.

53.     As provided at 34 C.F.R. § 30.22(d), DOE sends its pre-offset notice (the *Debt Statement*, *Proposed Treasury Offset Notice*, and *Request for Review* form) only once.

54.     Indeed, DOE's *Proposed Treasury Offset Notice* states in underlined, boldface type: "**Important: This notice explains how to avoid offset . . . . Neither ED nor Treasury will provide an additional notice . . . [prior to] a Treasury offset against future payments.**"

55.     In a recent study, the General Accounting Office found that many borrowers defaulted on their student loans ten (10) years before their Social Security payments were offset. GAO- 17-45, *Social Security Offsets: Improvements to Program Design Could Better Assist Older Student Loan Borrowers with Obtaining Permanent Relief*, p.12, 56 (December 2016), GAO Report available at https://www.gao.gov/assets/690/681722.pdf (hereinafter "GAO Report").

56.     Indeed, 68% of borrowers who defaulted were not receiving Social Security payments when they defaulted on their loans. *Id*. at 56. This means that most borrowers received DOE's proposed Treasury Offset Notice before they were disabled and eligible for a disability discharge, thus rendering notice of the right to a disability discharge meaningless.

57.     A borrower whose student loan debt has been reduced to a federal court judgment receives a Department of Justice (DOJ) "Notice of Intent to Offset." This notice follows statutory and regulatory language that advises the borrower of his or her right to pay the debt in full, review debt records, demonstrate why the debt is not in default or is not enforceable, and avoid offset by arranging a repayment plan. 28 C.F.R. § 11.9(c). However, the DOJ notice does not inform a

10

borrower who is disabled of his or her ability to preserve basic SSA income through a DOE disability discharge.

**Treasury Matches Debtors against SSA's Payment Files**

58.     If DOE or DOJ does not receive a timely objection from the borrower after mailing the pre-offset notice, DOE or DOJ then certifies the debt for offset and sends it to the U.S. Treasury. Treasury places that information in a National Interactive Delinquent Debtor Database of persons certified for offset from over 30 creditor agencies. SSA Program Operation Manual System, Benefit Payment Offset, GN 02410.300(A)(2) (Sept. 3, 2013)(hereinafter "POMS GN 02410.300(A)(2)"). Persons who owe child support or tax debt are not included in this database.

59.      On information and belief, student loan debts are the primary debt for which Social Security payments are offset by Treasury. POMS GN 02410.300(A)(2).

60.     On information and belief, DOE and DOJ know which debts they certify for offset are student loan debts potentially dischargeable due to the borrower's disability

61.     On information and belief, Treasury knows or can easily know which debts DOE and DOJ certify for offset are student loan debts potentially dischargeable due to the borrower's disability.

62.     After a certified debt is placed in Treasury's delinquent debtor database, Treasury periodically runs the borrower's name through its electronic payment files to determine if the borrower is due any federal benefits that can be offset.

63.     On information and belief, SSA creates one of the electronic files that Treasury periodically runs its matching program against. POMS GN 02410.300(C). SSA creates and sends

11

this file each month to Treasury. The file includes the amount of the payment due and the name and Social Security number of each recipient of benefits.

64. On information and belief, SSA's electronic file includes, or could include, the current address of the SSA recipient entitled to a Social Security payment.

65. That electronic file also includes a "bypass" code that exempts certain Social Security payments from offset. POMS GN 02410.300(B) and (C).

66. If Treasury matches an SSA beneficiary who should be offset that has a "bypass code," Treasury does not offset the Social Security payment of that beneficiary. *Id*.

67. On information and belief, SSA could, but does not use a bypass code that would identify a disability recipient scheduled for medical review once every 5 or more years.

68. On information and belief, SSA could, but does not use, a bypass code that would identify a disability recipient who has received disability benefits continuously for five or more years, or whose onset of disability and continuous eligibility for Social Security Disability payments has lasted more than five years.

**Treasury's Notices Following a Match**

69. When Treasury matches a Social Security recipient who does not have a bypass code, it sends its own pre-offset notice to the borrower with the heading *Your Social Security Benefit May Be Reduced This Is Not a Bill*.

70. This notice is sent twice: 60 days before the proposed offset and then 30 days before the proposed offset. GAO Report, 5 (2016); POMS GN 02410.300(D)(3).

71. The Treasury pre-offset notice states that the Social Security recipient's payment will be reduced by 15% but not below $750.00.

12

72.     The Treasury pre-offset notice states that the federal agency collecting the debt has already sent the borrower a notice detailing the borrower's rights and that neither Treasury nor SSA can answer the borrower's questions regarding the debt or the offset.

73.     Instead, the Treasury pre-offset notice provides the name and address of the "federal agency" that initiated the offset and informs the borrower that he or she should contact that agency "to stop the monthly reductions." When DOJ initiates the offset, the "federal agency" is the private attorney hired by DOJ. When DOE initiates the offset, the "federal agency" is either the Federal Offset Unit of DOE, or a Guaranty Agency working on behalf of DOE such as the New York State Higher Education Service Corporation or the Texas Guaranteed Student Loan Corp.

74.     Seventy-three percent (73%) of the pre-offset notices that Treasury sends to Social Security recipients go to persons who receive disability payments or who were receiving disability payments that later converted to retirement payments. GAO Report, pp. 11, 55 (2016).

75.     Although Treasury knows that the majority of the recipients of its *Your Social Security Benefit May Be Reduced* pre-offset notice are disabled, Treasury does not provide any information about the disability discharge in its pre-offset notice.

76.     Moreover, even though Treasury is required to take "reasonable steps" to notify a Social Security recipient of a pending offset, 31 U.S.C. § 3716(c)(7)(B), Treasury in many instances sends its pre-offset notice to an address where the intended Social Security recipient no longer resides.

77.     On information and belief, despite the fact that SSA has current address information for its recipients, Treasury instead uses the last known address it has in its own files, which is usually the address listed on the last tax return filed by the recipient.

78.     On information and belief, many student loan borrowers whose Social Security is subject to offset for student loan debts have not filed tax returns for many years because they do not owe taxes. Consequently, the address Treasury has on file is often stale.

79.     On information and belief, SSA does or could provide current address information regarding for its recipients in the monthly electronic file it sends to Treasury's offset unit.

### Treasury's Post-Offset Notice

80.     Each month, when a borrower's disability benefit is offset to pay for a student loan debt, Treasury sends a recurring post-offset notice bearing the heading *This is not a bill, retain for your records.* The post-offset notice provides the phone number to the collection agency working for DOJ, or the guaranty agency working for DOE, or the offset unit of DOE. The post-offset notice directs the borrower to contact that entity, not SSA or Treasury.

81.     Treasury's post-offset notice does not provide any information about a disabled borrower's right to protect disability benefits from offset by applying for a disability discharge.

82.     Treasury's post-offset notice is sent to the last known address of the borrower that Treasury has, regardless of whether SSA has information that the address has changed.

### Social Security's Notice

83.     Social Security provides no notice to a Social Security recipient whose benefits are offset for a student loan debt.

14

84.     Treasury sends copies of its pre-offset and post-offset notices to SSA so that SSA can provide creditor information to Social Security recipients who inquire about an offset.   POMS GN 02410.300(G). SSA workers are not permitted to give copies of the Treasury pre-offset and post-offset notices. POMS GN 02410.300(F)(2). A borrower cannot file an appeal with SSA regarding the offset. POMS GN 02410.300(G). When a Social Security recipient protests that she did not receive notice of the offset before it occurred, SSA workers are directed to provide a phone number to Treasury's offset unit. POMS GN 02410.300(G)(7).

85.     Although SSA workers can determine that DOE or a Guaranty Agency working for DOE is the creditor agency, SSA does not advise Social Security Disability recipients of their right to stop the offset by applying for a disability discharge.

**Social Security Recipients Seeking to Avoid Offset by Following Instructions on DOE's, DOJ's and Treasury's Notices are Unlikely to Learn about their Right to a Disability Discharge.**

86.     On information and belief, the agencies whose phone numbers are listed on the Defendants' notices rarely tell disabled borrowers who call that they can avoid the offset through the disability discharge program.

87.     On information and belief, DOE's compensation scheme provides strong incentives for its private collectors and Guaranty Agencies to withhold information about the statutory right to a disability-based discharge of student loan debt.

88.     On information and belief, borrowers who call DOE's Offset Unit routinely are told to call collection agencies hired by DOE to discuss repayment options. In 2014, a private collector for DOE earned only $150 for referral for a disability discharge, as opposed to earning 16% of all money collected through a payment plan. National Consumer Law Center, *Pounding Student Loan*

*Borrowers*, at 11 (Sept. 2014), available at

https://www.nclc.org/images/pdf/pr-reports/report-sl-debt-collectors.pdf.

89.     Similarly, a Guaranty Agency earned 16% of the amount collected on an

outstanding debt by steering a borrower into a rehabilitation payment plan, as opposed to earning a

nominal fee if the loan was discharged due to disability. See, e.g., Ben Miller, *How Ending the*

*Two Tiered System Student Loan System Would Help Struggling Borrowers*, The Chronicle of

Higher Education (May 15, 2015), available at

http://www.chronicle.com/article/How-Ending-the-Two-Tiered/230155/.

90.     On information and belief, DOJ's private collectors are similarly compensated so

that guiding a borrower into a rehabilitation or repayment plan generates more income to the DOJ

collector than processing a disability discharge.

91.     This compensation scheme which rewards repayment over discharge explains, at

least partially, why only a tiny minority of Social Security recipients get disability discharges after

their offsets begin. In 2016, the GAO studied what happened to the loans of Social Security

recipients after benefits began to be offset for student loan debt. During the five year period

following the first month that a Social Security payment were offset, only 14% of Social Security

recipients had their loans discharged due to disability. The other 86% of disabled borrowers with

offsets did not know of and did not attempt to access this right. Specifically, 43% either paid their

entire debt via the offset or were still paying it after five years. Approximately 17% of the

borrowers were steered into repayment plans that reduced the amount of the monthly payments but

left the borrowers with larger student loan debts. Another 11% received either a hardship

exemption or some unspecified relief that stopped collections but preserved the debt. Finally, 13%

16

of disabled borrowers died within the five year period while their benefits were still being offset. GAO Report, p. 23 (2016).

92.     On information and belief, tens of thousands of disabled Social Security Disability recipients lose a portion of their very limited income through the Treasury Offset Program because they do not receive timely and meaningful notice that they can protect their income through a statutory right to a disability-based discharge of student loans.

93.     Sixty percent of these offsets are against those whose benefits are below the median Social Security benefit level ($1,070). GAO Report, pp. 11, 16, 55 (2016).

94.     Social Security offsets for student loans have increased dramatically, from 31,000 in 2002 to 173,000 in 2015. GAO Report, p. 11 (2016). With 1.6 million borrowers over the age of 50 who are in default, but not yet in offset, this number will continue to increase. GAO Report, p. 10 (2016).

95.     Moreover, about half of Social Security recipients who experience offset will never repay their debts. This is because all of their offset payments are applied to fees and interest, not principal. GAO Report, pg. 19 (2016). In other words, offsets for about 85,000 Social Security recipients will never end because these borrowers' student loan debt is actually growing each month. *Id*.

**Almost Half of the Fees Treasury Earns in Student Loan Offsets Comes From Pockets of Disabled and Poor Social Security Recipients.**

96.     Each tax refund intercept offset generates a $17 fee for Treasury while each Social Security offset generates a $15 fee for Treasury. GAO Report, p. 18 (2016).

97.     In fiscal year 2015, Treasury's offset program collected $2 billion in defaulted student loans through tax refund intercepts and that collection generated $77 million in fees for

17

Treasury. In contrast, Treasury's offset program only collected $171 million in defaulted student loan debt through Social Security offsets. However, Social Security offsets, because they recur each month—and therefore, generate a monthly rather than one-time fee for Treasury—generated $71 million in fees. Treasury earned almost as much in fees by offsetting $171 million in Social Security benefits as it did by offsetting $2 billion in tax refunds. GAO Report, p. 18 (2016).

98.     In other words, poor and disabled Social Security recipients disproportionately finance Treasury's offset program, and the collection of fees from Social Security recipients is dramatically disproportionate to the amount of defaulted student debt collected. Fees constitute less than 4% of the debt collected on tax intercept offsets and almost 29% of the debt collected on Social Security offsets.

**A Large Percentage of Social Security Disability Beneficiaries Satisfy the Department of Education's Disability Discharge Standard and Would Benefit from a Notice Informing Them of Their Right to Discharge.**

99.     The majority of Social Security Disability recipients satisfy the statutory standard of eligibility for a student loan discharge because they have received disability benefits for more than five consecutive years. Indeed, recent SSA studies show that more than 85% of Social Security recipients remain continuously eligible for disability benefits for ten consecutive years. Sui Liu and David Stapleton, Center for Studying Disability Policy, *How Many SSDI Beneficiaries Leave the Rolls For Work*?, at 2 (April 2010) available at

https://www.ssa.gov/disabilityresearch/documents/TTW5_Brief_2_DIcohort_REV2.pdf ; SSA Office of Inspector General, *The Social Security Administration's Ability to Detect Disability Fraud* at 39 (Sept. 2014) available at

https://oig.ssa.gov/sites/default/files/testimony/SSA's%20Ability%20to%20Prevent%20and%20
Detect%20Disability%20Fraud_0.pdf.

100.    In March 2015, the White House recognized that a disproportionate number of
disabled Social Security recipients with student loan debt were needlessly being offset.   In a press
release regarding President Obama's *Student Aid Bill of Rights,* the White House stated DOE
would work with SSA "to ensure that disability insurance recipients who can discharge their
student loans are not instead seeing their disability payments garnished to repay defaulted loans."
https://obamawhitehouse.archives.gov/the-press-office/2015/03/10/fact-sheet-student-aid-bill-rig
hts-taking-action-ensure-strong-consumer-.

101.    In April 2016, DOE matched its records of borrowers against SSA's roll of
disability recipients scheduled for a 5 to 7-year medical review.   DOE found over 100,000
borrowers satisfied its TPD standard yet still were having their Social Security disability payments
offset for their student loan debts. GAO Report, p. 31 (2016).

102.    DOE reported to the General Accounting Office that in April 2016 it suspended
offsets against the borrowers it had matched.   DOE stated the suspension would continue as long
as SSA designated a borrower to a five to seven year medical review. GAO Report, p. 32 (2016).


## FACTS RELATING TO PLAINTIFFS

### Plaintiff Hector Rodriguez

103.    Hector Rodriguez served in the U.S. Army from 1969 to 1971.

104.    In about 1973, Mr. Rodriguez applied for and began receiving Social Security
Disability payments due to his psychiatric disorder, schizophrenia.

105.    In 1978, Hector Rodriguez borrowed $1,000 in federally insured student loans to attend Kingsborough Community College. In 1980, Mr. Rodriguez defaulted on his loans.

106.    At the time of the default, Treasury's offset program did not exist and hence there was no referral by DOE to Treasury.

107.    In 1999, Mr. Rodriguez was sued in this court for failure to repay his student loans under the caption *United States of America v. Hector Rodriguez*, 99 cv 6067. The United States was represented by Mullen & Iannarone, a private debt-collection law firm hired by the Department of Justice.

108.    In 2000, a default judgment was subsequently entered against Mr. Rodriguez in the amount of $1,694.04. Despite the judgment, no collection activity occurred on the debt for well over a decade.

109.    Meanwhile, Mr. Rodriguez continued to receive disability payments from Social Security and the Veterans Administration.

110.    No later than March 1, 2011, SSA assigned Mr. Rodriguez a "permanent impairment" designation by scheduling him for medical review every five to seven years. This designation meant Mr. Rodriguez was totally and permanently disabled and eligible for disability discharge of his student loans.

111.    Mr. Rodriguez was not aware of this designation, nor was SSA required to inform him of it.

112.    On October 3, 2013, DOJ sent Mr. Rodriguez its due process notice entitled "Notice of Intent to Offset." This notice stated that he owed $3,467 and that his Social Security Disability benefits would be offset.

113.    The DOJ notice failed to inform Mr. Rodriquez that he could preserve his subsistence income and suspend collection activity if he applied for and received a DOE disability discharge.

114.    The DOJ notice directed Mr. Rodriguez to contact DOJ's debt collectors, the law firm of Mullen & Iannarone, if he had questions or concerns.

115.    On information and belief, Mr. Rodriguez did not respond to DOJ's Notice of Intent in a timely or material manner and DOJ certified the debt for offset with Treasury.

116.    On information and belief, in November or December of 2013, SSA sent an electronic file to Treasury's offset unit. That electronic file included Mr. Rodriguez' name and Social Security number, a statement that Mr. Rodriguez was due a payment of $1,184, and a bypass code field that was empty of any coding that would exempt Mr. Rodriguez' disability payment from offset.

117.    On information and belief, SSA could, but did not use a bypass code that would have exempted Mr. Rodriguez's payments from offset as a permanently disabled person scheduled for SSA medical review once every 5 or more years.

118.     On information and belief, Treasury matched SSA's electronic file against its database and identified Mr. Rodriguez as a Social Security Disability recipient whose payment should be offset.

119.    Because SSA did not include a bypass code that Mr. Rodriguez was scheduled for a medical review for five or more years, Treasury was unaware that Mr. Rodriguez was exempt from offset.

120.    On or about January 3, 2014, the Department of Treasury sent Mr. Rodriguez a

Pre-Offset Notice that warned "Your Social Security Payment May be Reduced."   The notice warned that Mr. Rodriguez's SSA disability benefits would be reduced by 15% "unless you contact the following agency and meet their requirements to stop the monthly reductions." The agency was the law firm of Mullen & Iannarone with whom DOJ contracted. The Pre-Offset Notice did not inform Mr. Rodriguez that his SSA disability benefits would be protected if he applied for DOE's disability discharge program.

121.    The following month, he received another Treasury Pre-Offset Notice dated February 3, 2014.

122.    Mr. Rodriguez became distraught at the prospect of losing 15% of his Social Security payment. His budget was very tight. He received only $1184 from Social Security and $300 from the VA due to his disabilities.

123.    Not knowing what to do, Mr. Rodriguez consulted with a Veterans Administration social worker who advised Mr. Rodriguez to call the DOJ debt collector, Mullen & Iannarone.

124.    On or about February 28, 2014, Mr. Rodriguez called Mullen & Iannarone. He identified himself as a disabled veteran who relied on Social Security Disability benefits and VA benefits to meet his basic needs, described the financial hardship that an offset would cause, and asked the collector what she could do to prevent his income from being reduced.

125.    Although he did not use the words "accommodation," Mr. Rodriguez asked the collector to accommodate his disability so that he could participate in any of the applicable discharge programs available to borrowers.

126.    DOJ's debt collector told Mr. Rodriguez that the only way she could stop the

offset of his disability benefits was to enter a $100 a month payment plan with DOJ.

127.     DOJ's debt collector acted contrary to the disability discharge regulations when it withheld information about the disability discharge program even after Mr. Rodriquez explicitly asked about disability-based relief.

128.     DOJ's debt collector did not advise Mr. Rodriguez that he might be eligible for a discharge if the SSA scheduled his medical review for once every five or more years.

129.     DOJ's debt collector did not offer to contact SSA to determine Mr. Rodriguez' medical review period.

130.     DOJ's debt collector did not suspend collections activity to give him an opportunity to apply for a disability discharge.

131.     Mr. Rodriguez did not enter a payment plan at that time.

132.     On or about March 3, 2014, Treasury offset Mr. Rodriguez's Social Security Disability payment of $1,184 by $177.60.

133.     Thereafter, Mr. Rodriguez received monthly Post-Offset Notices from Treasury advising him to contact the same DOE debt collector if he had questions about the debt.   These notices did not explain that the offset could be stopped based on Mr. Rodriguez's disability.

134.     Unable to meet basic expenses with his post-offset income, Mr. Rodriguez signed the $100 a month payment agreement with DOJ's collectors in March 2014 and stopped the offset.   Thereafter, DOJ collected six payments of $100 each from Mr. Rodriguez from May to November 2014.

135.     In late May 2014, Mr. Rodriguez learned from Brooklyn Legal Services that he could stop the offset by applying for a disability discharge.

23

136.    Mr. Rodriguez did not know that he was already eligible for a student loan disability discharge by virtue of SSA medical review designation of once every five or more years.

137.    Mr. Rodriguez did not know his SSA designation, and his disability (schizoaffective disorder) made it difficult for him to find out because it required him to wait at an SSA office and then to interact with SSA workers with whom he had no relationship. Accordingly, he sought to qualify for a disability discharge by getting a VA doctor to complete the disability form.

138.    Mr. Rodriguez's doctor at the VA understood his mental illness and generally saw him within a few minutes of his scheduled appointments so as to minimize waiting time that made him uncomfortable.

139.    Consequently, Mr. Rodriguez asked his doctor at his next appointment in mid-June 2014 to complete DOE's one page "Physician's Certification of Disability."

140.    This VA doctor was an internist, not a psychiatrist.    Although Mr. Rodriguez gave him the form in June, the doctor advised Mr. Rodriguez in July 2014 that a psychiatrist must complete the form.

141.    During the summer of 2014, gave his psychiatrist the TPD form and waited many months for the psychiatrist to complete the form. While waiting, Mr. Rodriguez continued to pay $100 each month to DOE's collectors to avoid the offset of his Social Security Disability payments.

142.    Finally, on October 16, 2014, the psychiatrist completed the DOE's form and confirmed Mr. Rodriguez's eligibility for a disability-based discharge of his student loans.

24

143.    The completed disability discharge application was then submitted to DOE on October 22, 2014.

144.    On information and belief, DOE rejected the application because Mr. Rodriguez's Social Security number was miscopied on one of the four entries where that number appeared within the application form.

145.    On information and belief, DOE did not inform Mr. Rodriguez of the Social Security number discrepancy but instead sent a form letter, dated November 5, 2014, thanking him for inquiring about applying for a discharge and advising him he needed to file an application.

146.    The November 5, 2014 letter included a blank questionnaire for his doctor to complete. It also stated that in the alternative he could submit a letter from SSA showing his medical review was once every 5 to 7 years because of a permanent impairment.

147.    Frustrated, Mr. Rodriguez took the notice to Social Security on November 18, 2014. SSA gave him a letter dated November 18, 2014 stating his review period was seven years due to a permanent impairment and his next review would not occur until March 2018.

148.    While he was able to get the SSA statement, doing so was difficult due to his psychiatric condition. The SSA office was crowded and he thought people were looking at him with bad thoughts. He had to wait about an hour, during which time he repeatedly left the office to calm his nerves and to get away from the other people waiting to be seen by SSA workers.

149.    On November 19, 2014, Mr. Rodriguez and his legal services advocate called DOE's disability discharge servicer, Nelnet and learned there was some confusion regarding Mr. Rodriguez's Social Security number.   He faxed the November 18, 2014 letter from SSA with

25

proof of his Social Security number.

150.     Believing his loan was going to be discharged, Mr. Rodriguez stopped making payments of $100 to DOE on or around December 1, 2014.

151.     DOE waited five months from receipt of the corrected Social Security number in the reconsideration request before discharging Mr. Rodriguez's student loan debt on April 22, 2015. The discharge was effective April 22, 2015, even though Mr. Rodriguez's psychiatrist found him disabled and eligible for a discharge on October 16, 2014.

152.     Despite the discharge of his student loan debt as of April 22, 2015, Mr. Rodriguez's disability benefits were offset again in May 2015 and June 2015.

153.     For each of those months, his total monthly income was reduced by $164.85 from $1,099 to $934.15.

154.     On information and belief, these moneys were never returned.

155.     On information and belief, from the time that DOJ issued its October 3, 2013 Notice of Intent to Offset through the date of the final offset in June 2015, Mr. Rodriguez was eligible for a student loan disability discharge due to his receipt of Social Security Disability benefits for more than five years. He was also eligible for a DOE disability discharge because in 2011 SSA scheduled him for a seven year medical review.

**Plaintiff Claudia Cort**

156.     From 1996 to 2000, Claudia Cort borrowed $11,625 in federally insured student loans to attend the College of New Rochelle. Ms. Cort earned a BA in Psychology.

157.     After completing her degree, Ms. Cort worked for the city of New York. She repaid, with interest, $7,707 of the $11,625 borrowed.

158.    In 2007, she lost her job after a bad car accident in which she fractured many bones. Although she continued to repay her student loans with her worker's compensation payments, eventually she was unable to do so.

159.    In the late summer or fall of 2014, Ms. Cort's financial situation worsened.   She applied for Social Security Disability benefits alleging that her disability began shortly after the car accident. That application was denied and appealed.

160.    On September 26, 2014, while her SSA disability appeal was pending, Ms. Cort defaulted on her federal student loans. At that time, Ms. Cort was living at 39-89 50th Street in Woodside, New York. This is where Ms. Cort had lived since at least 2003 and the address she had provided to the IRS when she paid her taxes.

161.    Sometime in 2015 or 2016, DOE sent a pre-offset notice advising Ms. Cort of its intent refer her debt for U.S. Treasury offset. That notice included a statement that Ms. Cort could avoid offset if she was disabled. It also advised her that she would not receive any other notice from DOE regarding her rights to avoid offset in the future.

162.    Ms. Cort does not recall receiving DOE's pre-offset notice. In any event, at the time DOE sent the notice, Ms. Cort was neither receiving Social Security Disability benefits nor adjudicated as disabled by SSA.

163.    In April of 2016, Ms. Cort moved from Woodside New York to her current address in Brooklyn. She advised the Social Security Administration and the post office of her move.

164.    In the fall of 2016, SSA found Ms. Cort disabled. SSA adjudicated her onset of disability as January 1, 2011. This meant Ms. Cort's disability had existed continuously for more than five years, thereby satisfying DOE's total and permanent disability discharge standard.

165.     On information and belief, SSA in September or October 2016 scheduled Ms. Cort's next medical review for September 2018, which also reflected a medical review of more than five years since the onset of her disability in January 2011.

166.     On information and belief, although Defendant DOE had decided not to offset Social Security recipients with such 5 to 7 year review designations, defendants SSA and Treasury failed to take steps to ensure Ms. Cort was so protected.

167.     On information and belief, around October 2016, the SSA determined that Ms. Cort was due her first payment of $1,617.

168.     On information and belief, SSA simultaneously sent an electronic file to Treasury's offset unit that reported Ms. Cort was due a $1,617 payment.

169.     SSA did not use a bypass code in this electronic transmission to identify Ms. Cort as being permanently disabled with a medical review once every five or more years and therefore eligible for a student loan disability discharge.   Nor did it use a bypass code indicating she had been disabled for a continuous period of more than five years and thus eligible for a student loan disability discharge.

170.     On information and belief, the electronic file SSA sent to Treasury's offset unit included or could have include the latest address that Ms. Cort reported to SSA, the agency from whom she was due a monthly payment.

171.     On information and belief, around October 2016, Treasury matched the information it was given from DOE against SSA's records and identified Ms. Cort's payment as one eligible for offset because it did not contain any bypass code exempting her.

172.     On information and belief, because Ms. Cort last filed taxes while living at 39-89

50th Street in Woodside, New York, Treasury sent its notices to Woodside even though Ms. Cort no longer lived there and SSA had her current address.

173.     Despite having asked her post office to forward mail to her new address, Ms. Cort did not receive Treasury's pre-offset notice or any of its post-offset notices.

174.     In late December 2016, Ms. Cort noticed that her only source of income, $1,617 in Social Security Disability, had been reduced by $242.55.   Because Ms. Cort had not received any of Treasury's notices, she called SSA and learned that the offset was for a student loan debt. Around this time, Ms. Cort overheard a conversation in a doctor's office that student loans could be forgiven if a person was disabled.

175.     Ms. Cort searched the internet and learned how to apply for a student loan disability discharge.

176.     Seeking a discharge based on her receipt of Social Security Disability, Ms. Cort obtained a letter from SSA dated January 11, 2017.   It stated Ms. Cort "became entitled to Social Security Disability effective August 2013. [Her] first medical review is scheduled for September 2018."

177.     In January 2017, Ms. Cort filed a disability discharge application to which she attached an SSA letter that stated she was entitled to disability benefits as of August 2013 and that her next medical review was September 2018.   DOE's agent, Nelnet wrote on February 15, 2017 that Ms. Cort's Social Security would continue to be offset until a decision was made.

178.     On March 21, 2017, DOE denied Ms. Cort's application for a disability discharge. The reason was that Ms. Cort had not provided an SSA Notice of Award stating that "your next medical review will be within 5 to 7 years."

179.     Ms. Cort then sought legal representation with Legal Services. On April 5, 2017, she filed a new disability discharge application to which she attached a BPQY report from SSA in which SSA stated she was disabled as of January 1, 2011, with a date of entitlement as of August 2013.   Her next medical review was scheduled for September 2018.

180.     On April 5, 2017, Ms. Cort and her attorney called DOE's agent, Nelnet and then DOE's Offset Unit in Texas trying to get the offset stopped in light of the recent application. DOE and its agents stated they could stop the offset only if she was granted a hardship deferment which would take 45 days to process.   Believing the disability discharge would be decided at the same pace, Ms. Cort did not file the hardship application.

181.     On May 18, 2017, DOE granted Ms. Cort's disability discharge application, effective April 6, 2017.   This meant that four offsets preceding this effective date ($242.55 from December 2016 through late March 2017) would not be returned.

182.     The offsets caused hardship to Ms. Cort.   Her rent is $1,000 a month, leaving her with only $374 for food and other necessities.   Because of the offset, Ms. Cort postponed medical treatment she needed because she could not pay the co-pay due at each visit.

183.     Had Ms. Cort been given notice that the Social Security payment she relied upon for her daily needs was about to be offset in the Fall of 2016, and that she could avoid offset by applying for a disability discharge, she would have applied for the discharge well before the offset began.

**Plaintiff Manual Roberts**

184.     From 1980 to 1983, Manuel Roberts borrowed $15,550 in federally insured loans to attend the University of Southern California. He was psychiatrically hospitalized during his

30

final year and never earned a degree.

185.    From 1985 to 1998, he worked in various entry-level jobs at banks and temp agencies. He repaid, with 7% interest, $12,500 of the $15,550 he borrowed.

186.    On January 30, 1990, he defaulted on his two federally insured loans of $1,100 and $1,950.

187.    On information and belief, sometime between January 31, 1990 and January 24, 1991, DOE sent a pre-offset notice advising Mr. Roberts of its intent to offset any federal payments he received or would receive. At that time, Mr. Roberts was working and not receiving Social Security Disability payments. Apparently, he responded because on January 24, 1991, DOE sent a letter to Mr. Roberts stating that it had advised the IRS not to offset any future tax refunds.

188.    In 1992, a private law firm under contract with DOJ obtained two default judgments against Mr. Roberts for the his two defaulted loans in the amount of $2,873.70 and $1,644.04 in the Eastern District of New York under Index Numbers 1991-cv-2602 and 1991-cv-2603.

189.    On October 15, 2002, Mr. Robert was assaulted, and he suffered a fractured skull and brain damage. Thereafter, he applied for and received Social Security Disability benefits starting in 2005.

190.    On October 3, 2013—some twenty-two years after Mr. Roberts received DOE's pre-offset notice and approximately eight years after Mr. Roberts was found eligible for Social Security Disability —DOJ sent Mr. Roberts a "Notice of Intent to Offset." At the time, Mr. Roberts was receiving approximately $1,342 per month in Social Security Disability benefits.

191.    The DOJ notice did not inform Mr. Roberts that his SSA income could be preserved if he applied for and received a DOE disability discharge.

192.    Mr. Roberts did not respond as he did not think he had any defenses and consequently DOJ certified his student loan debt for offset with Treasury.

193.    On information and belief, in November or December 2013, SSA sent an electronic file to Treasury in which it reported Mr. Roberts was due a payment of $1,342.   The electronic file did not include a bypass code indicating Mr. Roberts had received disability payments continuously for more than five years.

194.    Treasury thereafter matched Mr. Rodriguez against SSA's electronic file and its offset database, and finding no bypass code, sent two pre-offset notice in January 2014 and February 2014 warning him "Your Social Security Benefit May Be Reduced."

195.    The Treasury pre-offset notices provided the name of a law firm under contract with DOJ as the creditor agency. Mr. Roberts did not call the law firm because he did not think he had any defenses to repayment.

196.    On or about March 3, 2014, Mr. Robert's Social Security Disability check was offset by $204.60, leaving him with only $1,159.40 to live on each month. Thereafter, the offset continued during which Treasury each month sent Mr. Roberts its post-offset notice advising him to call the collector and consult earlier notices that had been sent to him regarding his rights.

197.    Because the offset caused hardship and because the notices he received did not advise Mr. Roberts of any relief he might be eligible for, he sought legal assistance.

198.    On March 4, 2014, he paid $150 to a student loan debt relief company in Illinois, that, unbeknownst to Mr. Roberts, had earned an "F" from the Better Business Bureau for repeated

failure to provide meaningful service. The company was eventually closed down by the Illinois Attorney General.

199.    On March 26, 2014, Mr. Roberts contacted Brooklyn Legal Services where he finally learned that he could avoid further offset if he applied for a disability discharge.

200.    On March 31, 2014, Mr. Roberts' neurologist completed the Physician's Certification for the Total and Permanent Disability (TPD) discharge application. The doctor indicated that Mr. Roberts was disabled by his head injury as it impaired his ability to complete tasks and interact with people. On April 8, 2014, Mr. Roberts submitted his TPD application to DOE.

201.    However, because Mr. Roberts had not signed the application, DOE did not process the application. On September 16, 2014, DOE denied the application after Mr. Roberts failed to respond to an earlier DOE letter advising him he needed to sign the application. In its denial notice, DOE stated it would "reevaluate" Mr. Robert's application if he submitted additional evidence within a year.

202.    Because Mr. Robert's application was denied, offsets continued. By February 5, 2015, DOJ on behalf of DOE had offset $2,163.01 in Social Security payments.

203.    These offsets caused great financial hardship. Mr. Robert's overdrew his bank account multiple times trying to meet his expenses with his decreased income which in turn triggered expensive bank fees. Eventually, his phone service was disconnected, and he defaulted on two credit cards.

204.    On February 5, 2015, Mr. Roberts submitted the TPD application with his signature to DOE.

205.     During 2013 and 2014, Mr. Roberts was able to work a little despite his disability, as allowed by Social Security and DOE rules. As a result, Mr. Roberts was entitled to a tax refund in 2015.

206.     On March 19, 2015, Treasury sent a notice that advised Mr. Roberts that his $3,319.07 tax refund had been offset to repay his student loan debt.

207.     On May 20, 2015, DOE found Mr. Roberts disabled. However, it listed the date of disability as May 20, 2015 rather than March 31, 2014, the date the doctor originally certified Mr. Roberts' disability. Consequently, no offset moneys prior to May 20, 2015, including the tax refund intercept, were returned.

208.     In 2016, pro bono counsel wrote to DOJ's private collection firm requesting DOJ return monies taken after March 31, 2014. The private law firm working for DOJ was unresponsive.

209.     Had Mr. Roberts been timely informed of his right to avoid offset by applying for a disability discharge in October 2013 and thereafter, he would have applied for a discharge prior to the offset and thereby avoided offset altogether.

**Plaintiff Arma Bailey**

210.     In 1986, Mr. Arma Bailey borrowed $2,500 in federally insured loans to go to a radio broadcasting school. Mr. Bailey never worked as a broadcaster. Instead, he worked as a security guard and then later in copying rooms at various banks and investment houses.

211.     Mr. Bailey never made any payments on the student loan. In 1993, the loan went into default.

212.     Mr. Bailey has no recollection of receiving a pre-offset notice from DOE.

213.    On information and belief, if DOE sent a pre-offset notice advising Mr. Bailey of its intent to offset any federal payments he received or would receive, it sent that notice sometime between 1993 and 2008. On information and belief, if DOE sent the pre-offset notice, it included notice of his right to avoid offset if he was disabled and applied for a disability discharge.

214.    During 1993 and 2008, the period in which DOE sent or should have sent the pre-offset notice, Mr. Bailey was working and not receiving Social Security Disability payments.

215.    In about 2008 and 2009, Mr. Bailey's federal tax refunds were offset by DOE to repay his defaulted student loan.

216.    By 2010 or 2011, his health had deteriorated due to diabetes and he was unemployed. He needed a cane to walk and had pain and numbness in his hands and legs. Unable to work, he applied for and eventually received Social Security with an onset date of June 9, 2011.

217.    In late 2012 or early 2013, Mr. Bailey received his first monthly Social Security Disability check of approximately $900.

218.    On information and belief, in late 2012 or early 2013, SSA sent an electronic file to Treasury advising it that Mr. Bailey was due a payment of approximately $900. On information and belief, the electronic file contained or could have contained the address Mr. Bailey had provided SSA.

219.    On information and belief, Treasury thereafter matched SSA's electronic file against its delinquent debtor database and sent Mr. Bailey two pre-offset notices warning him of the impending offset. On information and belief these notices did not inform Mr. Bailey of his right to avoid offset if he was disabled.

35

220.     Mr. Bailey does not recall receiving either the two Treasury pre-offset notices bearing the warning *Your Social Security Benefit Payments May Be Reduced* or Treasury's post-offset notices that are sent monthly.

221.     On information and belief, Treasury used the address Mr. Bailey had when he last filed his tax returns, which he vacated prior to 2012 when he began receiving Social Security.

222.     Thereafter, Treasury offset $140 a month from Mr. Bailey's monthly Social Security payments.

223.     At some point, Mr. Bailey contacted SSA to ask why his Social Security was being offset. SSA informed him that he owed money to DOE. SSA did not advise him, however, of his right to stop the offset by applying for a disability discharge.

224.     On information and belief, between 2012 and 2016, over $5,000 was offset from Mr. Bailey's Social Security payments.

225.     The offset of $140 each month caused hardship. Between his rent, which was fortunately modest, and the offset, Mr. Bailey had only $400 each month with which to pay utilities and buy food, clothing, and other necessities.

226.     Unbeknownst to Mr. Bailey, on February 1, 2016, SSA changed Mr. Bailey's medical review period to once every 7 years.   This made him categorically eligible for a student loan disability discharge.

227.     On information and belief, Defendant DOE was aware of this designation by April 2016 when it matched its database of student loan borrowers against SSA's records of disabled borrowers subject to a 5 to 7 year medical review.   By April 2016, DOE had decided to suspend collection of such disabled persons subject to offset. GAO Report, p. 32 (2016).

36

228.     Despite this change in designation, SSA's electronic file that it sent to Treasury's offset unit from March 2016 onward did not include bypass coding that would have included the 5 to 7 year medical review designation to exempt Mr. Bailey from offset.

229.     In March or April 2016, Mr. Bailey heard on the news that disabled Social Security recipients who were offset for student loans could get their loans forgiven.   He contacted DOE, which sent him a letter, dated April 28, 2016, advising him to apply.   The letter stated the offsets would continue until a disability discharge was granted.

230.     On June 16, 2016, Mr. Bailey submitted a TPD application in which he included the wrong letter from SSA regarding his medical review period. When DOE alerted him of this error, he returned to SSA and got a BPQY form dated July 27, 2016 that showed his next medical review was in more than five years. In October or November 2016, DOE approved him for a disability discharge retroactive to April 5, 2016.   It also refunded him only two offsets of $145.20 taken in 2016, even though Mr. Bailey received his seven year designation on February 1, 2016 and thus was eligible for a refund of an additional $580.80 in moneys taken in 2016.

231.     Thereafter, Mr. Bailey asked DOE's disability servicer, Nelnet, to return all the offset moneys taken since 2012 since he was permanently disabled during the entire period of offset. Nelnet refused.

232.     Had Mr. Bailey been timely informed of his right to avoid offset by applying for a disability discharge, he would have been able to apply prior to the offset and would have had the opportunity to avoid it altogether.

**Plaintiff Kathy Liriano**

233.    Between 1993 and 1997, Ms. Liriano attended CUNY's Lehman College for which she borrowed $7,000 in federally insured student loans.

234.    After graduating in 1997, Ms. Liriano worked as a public, middle school teacher earning $25,000 a year. In an attempt to boost her earnings, Ms. Liriano enrolled in a Master's program at Fordham and borrowed an additional $32,968 in federal loans.

235.    Upon completing her masters in 2002, Ms. Liriano owed $37,009. Unfortunately, the Master's degree increased her income only slightly, and Ms. Liriano struggled to pay the increased student debt as well as support her son and two step-daughters.

236.    By 2004, Ms. Liriano had defaulted on her federal loans.

237.    On information and belief, DOE sent a pre-offset notice sometime between 2004 and 2010 advising Ms. Liriano of its intent to offset federal payments to recover the student loan debt. On information and belief, the DOE pre-offset notice included a statement that Ms. Liriano could avoid offset if she was disabled and applied for a disability discharge. On information and belief, DOE's pre-offset notice stated that DOE would provide no further notice to Ms. Liriano regarding her rights to avoid offset.

238.    Ms. Liriano has no recollection of receiving a DOE pre-offset notice.

239.    During the time that DOE sent the pre-offset notice, Ms. Liriano was not disabled and was working. Sometime between 2004 and 2010, Ms. Liriano earned a tax refund that was intercepted by Treasury to repay her student loan debt.

240.    About February 2015, Ms. Liriano began to receive Social Security Disability payments of approximately $1,400 a month due to chronic back and neck pain after a car accident.

241.    Around that time, SSA sent an electronic file to the offset unit at Treasury that

38

showed Ms. Liriano was due a $1,400 payment. The file also contained, or could have contained, Ms. Liriano's address that she provided SSA when she applied for and was granted Social Security benefits. Treasury matched that electronic file against DOE's list of debts certified for offset and identified Ms. Liriano's payment for offset.

242.   On information and belief, while Treasury could have obtained the current address of Ms. Liriano from SSA's electronic file, it did not do so. Instead, Treasury sent the pre-offset notice to the last known address it had on file, which was the address she used many years before when she was working and obligated to pay taxes.

243.   Consequently, Ms. Liriano has no recollection of receiving either Treasury's pre-offset or post-offset notices.

244.   From early 2015 to early 2017, Treasury offset about $3,104 of Ms. Liriano's Social Security.

245.   This offset caused considerable hardship. Prior to the offset, Ms. Liriano and her disabled son were so impoverished that her son qualified for Supplemental Security Income, a need based welfare program designed to assist impoverished families with little income and no assets. Because of the $194 offset each month, Ms. Liriano fell behind on her rent and utilities and had to skimp on food.

246.   On or about September16, 2016, Ms. Liriano called legal services and learned for the first time that if she was permanently disabled the offset could be stopped and her federal loans could be discharged.

247.   On October 12, 2016, Ms. Liriano filed an application with DOE for a disability discharge to which she attached a physician's certificate that was signed and dated September 22,

2016. While the application was pending, the offsets continued. In late 2016 or early 2017 the discharge application was approved. Ms. Liriano requested that DOE return all of her offset payments, but DOE refused to do so.

248.    Had Ms. Liriano been timely informed of her right to avoid offset by applying for a disability discharge, she would have been able to apply prior to the offset and would have had the opportunity to avoid it altogether.

### Plaintiff John Milas

249.    Between 1983 and 1985, Mr. Milas borrowed $5,718 in federally insured loans to attend the College of Staten Island, a CUNY school. He graduated in 1986 with an engineering degree after which he started to pay down his student loans.

250.    In the 1990's he began having health problems related to bipolar disorder.

251.    On November 22, 1998, he defaulted on his loans. Because his payments were inconsistent, and the loans carried 9% interest rate, he had paid down only a quarter of the principal at the time of the default.

252.     On information and belief, shortly after the default in 1998, DOE sent a pre-offset notice to Mr. Milas in which it advised him of his rights, including the right to avoid offset if he was disabled.

253.    Mr. Milas does not recall getting DOE's pre-offset notice. In any event, he was working and not disabled at the time the notice was sent.

254.    In 2012, Mr. Milas was laid off from a job, became homeless, and applied for and eventually was awarded Social Security Disability due to bipolar disorder, hearing loss, and arthritic knees.

255.    On information and belief, when his homelessness ended in about 2014, Mr. Milas provided his new address to SSA but not to Treasury.

256.    In 2015, SSA sent an electronic file to the offset unit of Treasury in which it reported that Mr. Milas was due a $1,054 payment. SSA's electronic file contained, or could have contained, the address Mr. Milas gave to SSA.

257.    In 2015, Treasury matched Mr. Milas debt against SSA's electronic file. On information and belief, although Treasury and SSA could have included information in SSA's electronic file that would have ensured Mr. Milas received Treasury's pre-offset and post-offset notices, they did not do so.

258.    Rather, Treasury sent the pre-offset notice to the address Mr. Milas used when he last filed taxes--the address he used in 2012 before he became homeless.

259.    Consequently, Mr. Milas did not receive any of Treasury's pre-offset or post-offset notices.

260.    Instead, in late 2015 or early 2016, Mr. Milas discovered that his monthly Social Security check of $1,054 had been reduced by about $158, leaving him with $896.

261.    In March 2016, Mr. Milas went to SSA and was given two Treasury post-offset notices, dated February 3, 2016 and March 3, 2016.

262.    Mr. Milas called the creditor agency listed on the post-offset notices, which was the DOE's federal offset unit.   He learned the offset was for a student loan debt. DOE's representative did not tell him his loan could be discharged if he was disabled even though Mr. Milas told him his disability benefits were being offset. That same day, Mr. Milas also called DOE's debt collector to

learn more about the debt. The collector did not advise Mr. Milas that his $13,621 debt could be discharged and the offset stopped if he was disabled.

263.    Paying off his $13,621 debt via monthly Social Security offsets of $158 would have taken Mr. Milas almost 12 years given the debt's large size and the high interest rate.

264.    The reduction in Social Security caused a hardship for Mr. Milas. With only $896 in monthly income, Mr. Milas was living below the poverty line for a single person.   Soon after the offset began, Mr. Milas fell behind on his rent.

265.    On July 18, 2016, Mr. Milas' landlord sued to evict him for non-payment of rent. The housing court referred Mr. Milas to Legal Services to prevent him from becoming homeless again. Ultimately, the welfare department paid Mr. Milas' his rent arrears, and the eviction proceeding was discontinued.

266.    On November 2, 2016, Mr. Milas learned from his Legal Services attorney that the Social Security offset could be stopped if he was disabled and applied for a discharge. This was the first time he had been told this.

267.    Unfortunately, Mr. Milas was initially unable to document his permanent disability. Mr. Milas' medical insurance had changed shortly before he learned of the availability of a disability discharge, and he had been forced to change doctors. Mr. Milas' new doctor did not have sufficient information to be able to affirm that his disability prevented him from working for five continuous years.

268.    Mr. Milas was also unable to get verification of his permanent disability from SSA because SSA listed his review period as "3+ years," not the five to seven years required by DOE.

42

269.     In January 2017, Mr. Milas informed DOE that he wanted to apply for a disability

discharge. DOE sent him a disability discharge application on January 27, 2017 and advised him

that collection activity that offsets would continue.

270.     On February 10, 2017, Mr. Milas contacted DOE by telephone and made a hardship

request for cessation of the offset. DOE stated he needed to file an application that it would mail to

him after which it could take up to 45 day to process. Mr. Milas filed such an application on March

7, 2017.

271.     Because of DOE's hardship process was so protracted, Mr. Milas consolidated his

loans get out of default on February 10, 2017.

272.     On information and belief, the loan consolidation ended the offset sometime in

mid-April 2017.

273.     On March 15, 2017, Mr. Milas' doctor completed DOE's TPD form, affirming that

Mr. Milas was permanently disabled. The application was submitted to DOE on March 16, 2017

and was granted with an effective date of May 12, 2017.

274.     Had Mr. Milas been informed of his right to avoid offset by applying for a disability

discharge, he would have applied for a discharge before the offset and not had his benefits offset

for more than a year.

**Plaintiff Fermina Soto**

275.     In 1988, Ms. Fermina Soto borrowed $2,558 to attend "City Technical Institute," a

low-quality, for-profit school which closed in 1991. Ms. Soto was referred to CTI by a welfare

office that required her to seek job training. At CTI, she trained to become a seamstress. She

stopped after five months because she could not understand what was being taught.   Ms. Soto has

a sixth grade education and speaks only Spanish. She never worked as a seamstress.

276.    In 1993, Ms. Soto defaulted on her federal loans.

277.    By 1993, Ms. Soto had married a factory worker who supported her and her children.

278.    On information and belief, sometime between the 1993 default and 1998, the DOE sent a pre-offset notice to Ms. Soto advising Ms. Soto of its intent to offset any federal payments she received or would receive. On information and belief, DOE's notice included a statement that she could avoid offset if she was disabled and applied for and was granted a disability discharge. Ms. Soto does not remember receiving such a notice.

279.    During this period from 1993 to 1998, Ms. Soto was a homemaker, caring for her children.   She was not disabled.

280.    In 1998, the Department of Justice obtained the debt from DOE and filed a federal lawsuit against Ms. Soto in the Eastern District of New York under the index number 98-cv-1032. That suit resulted in a default judgment of $4,439.07.

281.    On information and belief, sometime after obtaining the default judgment in 1998, DOJ through its agents, Mullane & Iannarone, sent a pre-offset notice advising Ms. Soto of its intent to offset any federal payments she received, including Social Security, that were due or that she would receive in the future. The notice did not advise her of her right to avoid offset by applying for a disability discharge.

282.    Following the death of her husband in 2003, Ms. Soto worked as a kitchen helper at a Senior Center for the New York City Department of Aging earning $7.10 an hour.

283.    Sometime after turning 62 years of age in 2008, Ms. Soto began receiving Social

44

Security Widow's benefits.

284.     By 2013, Ms. Soto was 68 years old and no longer working because of poor health. Her only source of income was her Social Security Widow's payment of $1,118 a month. With this, she paid rent, (about $708), leaving her with only $410 for food, utilities and other necessities. She made ends meet by eating regularly at the Senior Center where she was working at the time. Generally, she was able to get by on her Social Security without having to ask for help from her children.

285.     On information and belief, in late 2013 or early 2014, SSA sent an electronic file to Treasury's offset unit indicating Ms. Soto was due a $1,118 payment. Treasury matched Ms. Soto against DOJ's list of judgment debtors certified for offset and sent Ms. Soto two pre-offset notices in one month intervals warning her that "Your Social Security Benefit May Be Reduced."

286.     In January 2014, Ms. Soto responded to Treasury's pre-offset notice and visited her local Social Security office with her daughter Elizabeth Morales. She was told SSA could not stop the offset and that she should contact the creditor agency, Mullane & Iannarone, listed on Treasury's pre-offset notice.

287.     In January 2014, Ms. Soto and her daughter Elizabeth Morales called Mullane & Iannarone, the law firm working for DOJ. They told the firm that Ms. Soto's only income was Social Security and the offset would cause a hardship given her high rent and lack of food stamps. They asked Mullane & Iannarone, if Ms. Soto could pay $25. The firm explained the debt was for a student loan and said no.

288.     By April 3, 2014, Treasury was offsetting $167.70 each month from Ms. Soto's Social Security payment. This left her with only $243 for food and other necessities after she paid

her rent.

289.    Sometime prior to October 2015, Ms. Soto and her adult granddaughter went to an SSA office in Brooklyn. The SSA workers again told her SSA could not stop the offset. The offset continued.

290.    On information and belief, in early May 2016, Ms. Soto made another trip to her SSA office with another daughter, Mirabel Rodriguez. Ms. Rodriguez had taken time off from work and traveled from New Jersey to help her. An SSA worker gave Ms. Soto a copy of Treasury's post-offset notice dated May 3, 2016 that the worker obtained from SSA's computer system. Ms. Soto had dozens of such notices at home and began to cry. The SSA worker advised Ms. Soto that SSA could not do anything else.   Another SSA worker gave her a phone number for free legal help.

291.    On June 1, 2016, Ms. Soto met with an elder law attorney from Brooklyn Legal Services. The attorney called Mullen & Iannarone, the creditor agency listed on Treasury's May 3, 2016 post-offset notice. Ms. Martin, a representative for the law firm, explained that the debt was for a student loan. Ms. Martin did not advise the attorney that the loan could be forgiven if Ms. Soto was disabled and instead explained that the offset would continue.

292.    Thereafter, Ms. Soto lost touch with the elder law attorney.

293.    On February 24, 2017, Ms. Soto's daughter, Mirabel Rodriguez, contacted a student loan attorney at Brooklyn Legal Services and was given a TPD disability application for Ms. Soto's doctor to complete. Ms. Soto then waited four weeks for the next available appointment to see her doctor. On March 22, 2017, her physician completed the form indicating Ms. Soto was disabled by type 2 diabetes, degenerative joint disease, hypertension and obesity.   The completed

46

report was sent on March 29, 2017 to the DOE and is still pending.

294.    On information and belief, the offset of her Social Security continues through the date of this complaint.

295.    On information and belief, DOJ has offset at least $6,000 in Social Security Widows payments from Ms. Soto since April 2014.

296.    On information and belief, Ms. Soto was permanently disabled during that entire period, but unaware of her right to file for a disability discharge to avoid offset.

297.    This has caused financial hardship for Ms. Soto. She has no longer been able to pay her bills and must ask her children, who have their own financial difficulties, for financial help.

298.    Had Ms. Soto been advised by DOJ, DOE, Treasury and SSA that she could avoid offset by applying for a disability discharge, she would have done so earlier.

**Plaintiff Marshall Lee**

299.    Marshall Lee is a 61 year old Veteran who served as paratrooper in the 82nd Airborne from 1974 to 1978, and in the National Guard thereafter.    While in the service, he learned how to box and, at one point, fought the Olympian, Sugar Ray Leonard (who knocked him out).

300.    In 1979, he enrolled at a community college in New York City, for which he borrowed $2,000.   He dropped out and eventually defaulted on his loan in 1984.

301.    Thereafter, Mr. Lee work as a security guard until his mental illness and substance abuse rendered him homeless and unemployed.

302.    Sometime after 1989, DOE sent a pre-offset notice advising Mr. Lee of its intent refer his defaulted student loan debt for U.S. Treasury offset.   On information and belief, that

notice included a statement that Mr. Lee could avoid offset if he was disabled.   On information

and belief, DOE's notice also advised Mr. Lee that he would not receive any further notices from

DOE about his rights to avoid offset.

303.    Mr. Lee's psychiatric illness and homelessness eventually led to his hospitalization

at Creedmoor Psychiatric and the VA. He was diagnosed with bi-polar disorder and schizophrenia.

The psychiatric medication he received as an inpatient and outpatient made him lethargic and

easily confused.

304.    In 2000, Mr. Lee qualified for Social Security Disability benefits.   Because his

disability payment was below the $750 offset floor, his payment was statutorily protected from

Treasury offset.

305.    On or about July 1, 2014, the SSA designated Mr. Lee's disability as permanent and

thus necessitating a medical review of only once every seven years.   Mr. Lee was not aware of this

designation and would not learn of it until May 2017.

306.    On information and belief, in late 2014 or early 2015, Mr. Lee's Social Security

Disability payment increased to $776 taking it above the $750 offset exemption amount. On

information and belief, in late 2014 or early 2015, SSA sent an electronic file to Treasury

indicating Mr. Lee was due a $776 payment.   The electronic file did not include a bypass code

indicating Mr. Lee had been designated by SSA as permanently disabled and thus eligible for a

student loan discharge.   Nor did it include a bypass code indicating Mr. Lee had received

disability payments continuously for more than five years.

307.    Treasury thereafter ran its offset data base file against SSA's electronic file,

matched Mr. Lee's payment of $776 a month, and finding no bypass code in SSA's electronic file,

sent two pre-offset notice in January 2015 and February 2015 warning him "Your Social Security Benefit May Be Reduced."

308.    The letters stated the reduction would begin March 2015 and that the U.S. Department of Education, c/o New York State HESC was the creditor agency that had ordered the offset.   It advised Mr. Lee to contact HESC which "has previously sent notice to you . . . . [that] included . . . the rights available to you."

309.    After his check was offset by $26 in March 2015, Mr. Lee contacted Treasury in an attempt to stop the offset.   On March 23, 2015, Treasury responded with a two page form letter telling Mr. Lee to contact the "creditor agency" which will advise him of his rights.

310.    On information and belief, sometime between March 23 and June 1, 2015, Mr. Lee called DOE or its agent, New York HESC, and learned that he owed over $8,000 on the defaulted loan.   Although HESC knew Mr. Lee was disabled due to his receipt of Social Security, its agent did not inform Mr. Lee that he could avoid offset by applying for a disability discharge.

311.    On June 16, 2015, Mr. Lee contacted Brooklyn Legal Services and thereafter was given a physician's certification for a doctor to complete so as to get his loan discharged and his money returned.

312.    Thereafter, Mr. Lee was unable to get a doctor to fill out the physician's certification.   Mr. Lee had undergone a hip replacement and no longer saw a psychiatrist on a regular basis.

313.    Although Mr. Lee was advised by VA personnel that his disability was psychiatric, and that he needed to get psychiatric care before the form could be completed, Mr. Lee was reluctant to do so.   He was fearful that he would be forced to take medicine or would be

hospitalized against his will.

314.    Consequently, the offset continued throughout 2015 and 2016. The first $15 of each offset was taken by Treasury as a fee.   The remaining $11 that went to the Department of Education did not cover the interest that accumulated each month on the loan.   Mr. Lee's student loan debt was growing despite the offset.

315.    The offset, while small, had consequences.   One hardship was Mr. Lee's inability to fully pay his electric bill.   He entered into a repayment agreement to avoid termination of his service, and he now pays an additional $30 on each bill to avoid losing his electricity.

316.    In April 2016, the Department of Education matched its data base of student loan borrowers against SSA's records of Social Security Disability recipients with the five to seven year review designation and, on information and belief, identified Mr. Lee as a permanently disabled borrower subject to offset. Although DOE stated it was suspending offsets against such persons as Mr. Lee, GAO Report at 32 (2016), Mr. Lee's offset continued throughout 2016.

317.    Frustrated by his inability to get a doctor to complete the psychiatric form, Mr. Lee traveled in person to his local SSA office on January 17, 2017, to obtain a written statement of SSA's medical review period.   Mr. Lee asked an SSA worker specifically whether his medical review period was 5 to 7 years, thereby enabling him to discharge his student loan. Rather than provide Mr. Lee with the requested information, the SSA worker gave him copies of award letters from 2005 and 2017.   Neither stated what his review period was.

318.    Assured that he would not be hospitalized or medicated, Mr. Lee started psychiatric treatment at the VA in early 2017.   He was told his psychiatrist would not complete the disability questionnaire until she got to know him as a patient, which would take several visits.

50

319.    On March 6, 2017, Mr. Lee called the number on a Treasury Post-offset notice he
had recently received and spoke to DOE's agent at New York HESC.   Mr. Lee told the HESC
agent that he was disabled, 61 years old, and wanted to stop the Social Security Disability offset
because it caused hardship. The operator, a man named Todd, stated that HESC could only reduce
the payment to $5.00 a month, and told Mr. Lee to fax information about his income.   On
information and belief, the HESC agent was steering Mr. Lee into a rehabilitation program
whereby HESC would add 16% (about $1,280) to Mr. Lee's outstanding debt when Mr. Lee
rehabilitated his loan. The HESC operator did not suggest he apply for a disability discharge.

320.    Mr. Lee's request for help in stopping his offset because he was disabled
constituted a request for an accommodation under Section 504 of the Rehabilitation Act.

321.    Shortly thereafter, a HESC representative sent Mr. Lee a disability application.
On information and belief, the HESC representative took no steps to determine whether Mr. Lee
was automatically eligible for a discharge because of a seven year medical review designation by
SSA.

322.    Despite HESC's understanding that Mr. Lee was interested in filing for a disability
discharge, it continued to offset his payments in April and May 2017.

323.    On May 24, 2017, a treating psychiatrist signed a TPD report in which she reported
Mr. Lee was disabled by a psychotic disorder and depression that prevented him from
"understanding directions" and maintaining attention. His executive functioning and problem
solving were also "limited."

324.    On May 30, 2017, Mr. Lee and his attorney at Legal Services called the SSA.
After a 25 minute phone call, SSA faxed a BPQY form that stated Mr. Lee's medical review period

was 7 years, effective July 2014. This meant Mr. Lee had been eligible for a disability discharge the entire period during which his Social Security was offset.

325.    On May 30, 2017, Mr. Lee filed a TPD application with the DOE agent, Nelnet.   In that letter, Mr. Lee included the SSA BPQY form showing the seven year review designation in July 2014, the receipt of disability payments for more than five consecutive years, the treating psychiatrist report dated May 24, 2017, attesting continuous disability for 60 months, and the January 2017 letter in which Mr. Lee asked SSA whether his medical review period was more than five years.   In his application, Mr. Lee asked the DOE to find him disabled retroactively to the date the offset began in March 2015 based on SSA's 7 year medical review designation in 2014.

326.    On June 3, 2017 and July 3, 2017, Mr. Lee's Social Security Disability payment was offset despite his filing of the TPD application on May 30, 2017.

327.    On June 29, 2017, the DOE determined Mr. Lee was eligible for a discharge effective June 29, 2017.   On information and belief, by this time, Defendants had offset over $600 from Mr. Lee's Social Security Disability payments.

328.    Sometime in July 2017, Mr. Lee received a $517 check from NY HESC without any explanation for the reimbursement.   Although Mr. Lee and his lawyer called HESC, HESC was unable to explain why only $517 was returned when over $600 had been offset.

329.    Had Mr. Lee been advised in a timely fashion of his right to avoid offset by applying for a disability discharge, he would have done so earlier and avoided offset.

### Plaintiff Linda Carrasquillo

330.    In 2001, Linda Carrasquillo obtained a parent plus loan for $4,000 so that her daughter could complete her senior year of college.   Ms. Carrasquillo took out the loan because

her daughter had already taken out the maximum amount of federal student loans allowed ($23,000), and could not obtain any additional student loans. At the time she signed the loan, Ms. Carrasquillo earned about $25,000 a year cleaning the seats and floors of city buses.

331.    From 2002 to 2005, Ms. Carrasquillo stayed current on the loan through a combination of payments, deferments and forbearances.

332.    In 2005, Ms. Carrasquillo was injured on the job and stopped working.   She applied for Social Security Disability benefits and eventually won her case before an administrative law judge in late 2007 with an onset of disability of May 3, 2007.

333.    With her reduced income, Ms. Carrasquillo defaulted on her Parent Plus loan.   On information and belief, the default occurred sometime in 2008.

334.    On information and belief, sometime in 2008 or 2009, DOE sent a pre-offset notice advising Ms. Carrasquillo of its intent to offset any federal payments she received or would receive.   On information and belief, that DOE pre-offset notice included notice of her right to avoid offset if she was disabled and applied for a disability discharge.

335.    Ms. Carrasquillo does not recall receiving such a notice.

336.    On information and belief, at the time DOE sent its pre-offset notice, Ms. Carrasquillo's Social Security disability payment was less than $750 a month and thus exempt from offset.   Consequently, if she did receive the notice, she had no reason to carefully review it.

337.    By December 2009 or January 2010, Cost of Living Increase raised Ms. Carrasquillo's Social Security payment above $750.

338.    On information and belief, in late December 2009 or early January 2010, SSA sent an electronic file to Treasury reporting a $785 Social Security Disability payment was due to Ms.

53

Carrasquillo.

339.    Treasury thereafter ran its offset data base file against SSA's electronic file, matched Ms. Carrasquillo's payment of $785 a month, and sent two pre-offset notices in February 2010 and March 2010 warning her "Your Social Security Benefit May Be Reduced."

340.    On information and belief the notices stated the reduction would begin April 2010 and that the U.S. Department of Education, c/o the Texas Guaranteed Student Loan Corp was the creditor agency that had ordered the offset.   The notices advised Ms. Carrasquillo to contact Texas Guaranteed which "previously sent notice to you . . . . [that] included . . . the rights available to you."

341.    Thereafter, Treasury offset Ms. Carrasquillo's payment each month in 2010 and 2011 by $35.00, $15.00 of which went to Treasury and $20.00 of which went to DOE.   Ms. Carrasquillo received $750.

342.    In January 2012, Ms. Carrasquillo's disability payment increased again resulting in an offset of $65 a month.   She continued to net $750 a month.

343.    In January 2012, Ms. Carrasquillo's kidneys failed necessitating tri-weekly dialysis and a home attendant.

344.    On May 3, 2012, Ms. Carrasquillo had been disabled for five consecutive years under SSA's disability standard.

345.    During this time, Ms. Carrasquillo was consumed emotionally and physically with her end-stage renal failure and hence was not able to address many of her financial problems, including the offset of her Social Security Disability benefits for her student loan debt.

346.    In May 2012 and the months thereafter, SSA sent an electronic record to Treasury

54

indicating Mr. Carrasquillo was due a payment.   Because SSA's electronic record did not contain an exemption field showing that Ms. Carrasquillo had been disabled within the meaning of the Social Security Act for five consecutive years, Treasury continued to offset Ms. Carrasquillo's payments.

347.    In 2013, 2014 and 2015 the offset rate increased to $77, $89 and $103 a month, respectively, leaving Ms. Carrasquillo with only $750 a month.   During this time Ms. Carrasquillo continued to receive dialysis and continued to receive Treasury post-offset notices that did not advise her of her right to avoid offset if she was disabled.

348.    Throughout this period, the offsets caused financial hardship. Ms. Carrasquillo struggled to meet her basic needs.

349.    Sometime in 2015, Ms. Carrasquillo called the agent for the DOE listed on the Treasury offset notices, Texas Guaranteed.   The $103 a month offset was causing Ms. Carrasquillo a financial hardship given her limited income of $750 and her need for tri-weekly dialysis.   The representative at Texas Guaranteed told Ms. Carrasquillo that she owed about the same amount of money that she had borrowed ($4,000) because of the loan's high interest rate and penalties caused by the default.

350.    On information and belief, Ms. Carrasquillo informed the Texas Guaranteed representative that she was receiving Social Security Disability payments and repayment was causing a hardship.

351.    On information and belief, the Texas Guaranteed representative knew or could have easily confirmed that her Social Security Disability payments were being offset.

352.    Nevertheless, the Texas Guaranteed representative did not inform Ms. Carrasquillo

of her right to stop the offset if she was disabled by applying for and receiving a disability discharge.

353.    Thereafter, Treasury continued to offset her disability payments at the rate of $103 and $106 a month in 2016 and 2017 respectively.

354.    In October 2016, Ms. Carrasquillo received a kidney transplant at a hospital in Philadelphia.

355.    About the same time, she was also sued because she had fallen behind in her rent payments.   Facing eviction, Ms. Carrasquillo obtained legal help at Queens Legal Services on June 1, 2017.   On June 30, 2017, she complained to a housing paralegal about her inability to repay her Parent Plus loan despite seven years of offsets.   The paralegal referred her to a lawyer who specialized in student loans.

356.    On July 12, 2017, she met with the student loan lawyer and was given a disability discharge form for her doctor to complete.

357.    In July and August 2017, Ms. Carrasquillo was unable to attend important medical appointments with her kidney transplant doctor in Philadelphia because she did not have enough money to travel from Queens to Philadelphia.

358.    On July 27, 2017, Ms. Carrasquillo's general practitioner in Queens completed the disability form.   The doctor reported that Ms. Carrasquillo was permanently disabled because she could not use her hands, walk far, or see well due to diabetes, carpal tunnel syndrome, and other complications following her 2016 kidney transplant.   The disability discharge application was submitted on August 7, 2017 to the agent of DOE, Nelnet.   It is still pending.

359.    Ms. Carrasquillo's Social Security payment on September 3, 2017 was offset even

though she had filed the application almost four weeks earlier.

360.    Ms. Carrasquillo would have filed a disability discharge in 2010 and avoided over $6,000 is Social Security Disability offsets if Defendants had informed of this right shortly before offsets began or while the offsets were occurring.

## CLAIMS FOR RELIEF

### First Cause of Action

### Violation of Due Process – Constitutionally Inadequate Notice

### (On Behalf of all Plaintiffs against all Defendants)

361.    Plaintiffs reassert and reallege the above paragraphs and add the following to assert a violation of due process under the Fifth Amendment to the United States Constitution.

362.    Sections 702 and 706(2)(b) of the Administrative Procedure Act authorize federal court review of the constitutionality of the notices sent to Plaintiffs when Defendants offset their Social Security Disability benefits.

363.    Plaintiffs have a property interest in unfettered access to the full amount of their Social Security Disability benefits.

364.    Defendants deprived Plaintiffs of the full amount of their Social Security Disability benefits through Treasury offsets without meaningfully informing them in a timely manner of income-saving relief for which a significant majority of Social Security Disability benefit recipients are eligible: the disability-based student loan discharge.

365.     Defendant DOE deprived all the Plaintiffs of due process by not advising them within a reasonable time before the offset of their Social Security Disability benefits that they could protect their benefits from offset if they were permanently disabled and applied for a disability discharge.

366.     Defendant DOJ deprived Plaintiffs Hector Rodriguez, Manuel Roberts and Fermina Soto of due process by failing to inform them that their Social Security Disability benefits could be protected from offset if they were disabled and applied for a disability discharge.

367.     Defendant Treasury deprived all the Plaintiffs of due process by failing to inform them that their Social Security Disability benefits could be protected from offset if they were disabled and applied for a disability discharge.

368.     Defendant SSA deprived all of the Plaintiffs of due process by failing to provide any notice that their Social Security Disability benefits could be protected from offset if they applied for a disability discharge.

369.     The interest of Plaintiffs in protecting their principal source of income was paramount. Mr. Bailey only received $968, of which $420 is spent on rent. Ms. Liriano is so impoverished that her disabled son receives Supplemental Security Income. The offset of Mr. Roberts' check resulted in bank overdrafts with expensive fees. The offset of Mr. Milas' check made it impossible for him to become current once he fell behind on his rent, resulting in an eviction suit. Ms. Soto had to rely on her children for food and other necessities. Ms. Cort and Ms. Carrasquillo were unable to see their doctors because they lacked funds for co-pays or travel expenses. Mr. Lee received a shut off notice because he was unable to keep up with his electricity bills due to the offset. The reduction of their Social Security payments by Defendants DOE, DOJ

and Treasury caused Plaintiffs great financial hardship. In contrast, the burden on these three Defendants of adding the necessary information to their existing notices, or in the case of defendant SSA, of creating such a notice, is minimal.

370.   The notices provided by Treasury are constitutionally inadequate not only because they fail to provide any notice of the availability of avoiding the offset but also because their only instruction – directing the Social Security recipient to call DOE's agent or DOJ's debt collector – significantly increases the risk that a Social Security recipient will not be informed about the availability of a disability discharge given the disproportionate compensation provided for collecting rather than discharging loans.

371.   Providing notice about disability discharges and contact information for DOE's disability discharge servicer (Nelnet) on the face of DOE's, DOJ's and Treasury's notices would provide discharge-eligible borrowers with timely and meaningful opportunity to preserve their Social Security Disability benefits.

372.   Treasury's Pre-offset notices are not reasonably calculated to reach the Social Security recipient who is about to be offset. Treasury's mailing of notices to the address provided by the student loan debtor on her last tax return violates due process when SSA provides or can provide Treasury more recent information on the debtors' current address.

373.   Plaintiff Rodriguez seeks the return of Social Security moneys offset between March 3, 2013 and June 3, 2015 due to Defendants' failure to provide constitutionally adequate notice. Plaintiff Rodriguez also seeks the return of Social Security moneys he paid from May 2014 to November 2014 in order to avoid offset.

374.    Plaintiff Roberts seeks the return of Social Security moneys offset between October 3, 2013 and March 31, 2014 due to Defendants' failure to provide constitutionally adequate notice.

375.    Plaintiff Bailey seeks the return of Social Security moneys offset from 2012 to April 5, 2016 due to Defendants' failure to provide constitutionally adequate notice.

376.    Plaintiff Liriano seeks the return of Social Security moneys offset between early 2015 and October 12, 2016 due to Defendants' failure to provide constitutionally adequate notice.

377.    Plaintiff Milas seeks the return of Social Security moneys offset between late 2015 or early 2016 and November 3, 2016 due to Defendants' failure to provide constitutionally adequate notice.

378.    Plaintiff Cort seeks the return of Social Security moneys offset between December 2016 and the present due to Defendants' failure to provide constitutionally adequate notice.

379.    Plaintiff Soto seeks the return of Social Security moneys offset between early 2014 through the present due to Defendants' failure to provide constitutionally adequate notice.

380.    Plaintiff Lee seeks the return of Social Security moneys offset between March 2015 and July 2017 due to Defendants' failure to provide constitutionally adequate notice.

381.    Plaintiff Carrasquillo seeks the return of Social Security moneys offset between April 2010 and the present due to Defendants' failure to provide constitutionally adequate notice.

382.    Plaintiffs do not seek damages for their constitutional deprivation.

## Second Cause of Action

**The DOE's Permanent Disability Decision was Arbitrary and Capricious and in Violation of the Administrative Procedure Act.**

**(Plaintiffs Rodriguez, Roberts and Milas against Defendants DOE and DOJ)**

383.    Plaintiffs Rodriguez, Roberts and Milas reassert and reallege the paragraphs above and adds the following to assert a violation of the Administrative Procedure Act.

384.    Pursuant to its regulations, the Department of Education is required to use the date of the Doctor's Certification as the onset date for the disability discharge. 34 C.F.R. § 685.213(b)(4)(i)(A).

385.    Under 34 C.F.R. § 685.213(b)(4)(iii), once the Secretary of Education makes a disability determination, the Secretary is obligated to return to the borrower any student loan payments it collected after the onset date of the borrower's disability discharge.

386.    Although Mr. Roberts' doctor certified his disability on March 31, 2014, the Department of Education found him permanently disabled as of May 20, 2015.

387.    This permanent disability decision was a final, non-discretionary decision that was arbitrary and capricious.

388.    The DOE's decision deprived Mr. Roberts of a refund of $1958.41 of Social Security payments and a $3,319.07 tax refund offset that DOJ collected from April 3, 2014 to March 19, 2015.

389.    The failure of DOJ and DOE to return offset moneys taken after Mr. Robert's doctor certified him as disabled was arbitrary and capricious.

390.    Although Plaintiff Rodriguez's doctor certified his disability on October 16, 2014, DOE found him permanently disabled as of April 22, 2015.

61

391.    This permanent disability decision was a final, non-discretionary decision that was arbitrary and capricious.

392.    The DOE's decision deprived Mr. Rodriguez of a refund of payments the Department of Education collected by way of the Department of Justice from October 16, 2014 to April 22, 2015.

393.    The failure of DOJ and DOE to return offset moneys taken after Mr. Rodriguez's doctor certified him as disabled was arbitrary and capricious.

394.    Although Mr. Milas' doctor certified his disability on March 15, 2017, the DOE found him permanently disabled as of May 12, 2017.

395.    This permanent disability decision was a final, non-discretionary decision that was arbitrary and capricious.

396.    The DOE's decision deprived Mr. Milas of a refund of $158 of Social Security payments offset on April 3, 2017.

397.    The failure of DOJ and DOE to return offset moneys taken after Mr. Milas' doctor certified him as disabled was arbitrary and capricious.

398.    Plaintiffs do not seek damages for these APA violations, but instead the return of the taken moneys.

## Third Cause of Action

**The Department of Justice Decision To Continue Offsets when Plaintiffs Rodriguez, Roberts and Soto expressed interest in and/or applied for a disability discharge was Arbitrary and Capricious and in Violation of the Administrative Procedure Act.**

**(Plaintiffs Rodriguez, Roberts, Soto against Defendant DOJ)**

399.     Plaintiffs Rodriguez, Roberts and Soto reassert and reallege the paragraphs above and adds the following to assert a violation of the Administrative Procedure Act.

400.     The regulations of the Department of Education provide that once a borrower claims to be disabled and expresses a desire to apply for a disability discharge, collection activity is suspended for up to 120 days until an application can be received and ruled upon. 34 C.F.R. 685.213(b)(1)(ii). Collection activity likewise is suspended after the disability application is received by DOE.  34 C.F.R. 685.213(b)(3)(i).

401.     Collection activity includes offset of Social Security benefits.

402.     Although Mr. Rodriguez expressed an interest in applying for a disability discharge application when speaking with DOJ's collector in late February 2014, offsets and other collection activity were not suspended by DOJ thereafter. Nor were offsets or other collection activity halted when he applied for a disability discharge in October 2014.

403.     Similarly, although Mr. Roberts and Ms. Soto applied for disability discharges on April 8, 2014 and March 29, 2017, respectively, their offsets continued thereafter.

404.     The DOJ's decisions not to suspend offsets were final, non-discretionary decisions that were arbitrary and capricious depriving Mr. Rodriguez, Mr. Roberts and Ms. Soto of Social Security income.

405.    Plaintiffs do not seek damages for these APA violations, but instead the return of taken moneys.

### Fourth Cause of Action

**The DOE's Decision was Arbitrary and Capricious and in Violation of the Administrative Procedure Act because it failed to Suspend Offsets when Plaintiffs indicated an interest in and/or applied for a disability discharge**

**(Plaintiffs Milas, Cort, and Liriano, Lee and Carrasquillo against Defendant DOE)**

406.    Plaintiffs Milas, Cort, Liriano, Lee and Carrasquillo reassert and reallege the paragraphs above and adds the following to assert a violation of the Administrative Procedure Act.

407.    On January 27, 2017, DOE acknowledged that Mr. Milas' had called to ask how to apply for a disability discharge. Nevertheless, Mr. Milas' Social Security payments were offset on February 3, 2017 and March 3, 2017.  The offset continued on April 3, 2017 after he filed a disability discharge application on March 16, 2017.

408.    On February 15, 2017, DOE acknowledge receipt of Ms. Cort's disability discharge application, but continued offsetting her Social Security thereafter.  After her application was denied on March 21, 2017, Ms. Cort filed a new application with additional information. Offsets have continued thereafter.

409.    In October 2016, Ms. Liriano filed a disability application with DOE. Offsets continued despite the filing until the application was approved in early 2017.

410.    On March 6, 2017, Mr. Lee expressed an interest in obtaining relief from offset due to his disability to a New York HESC representative who was an agent of DOE.  On May 30,

64

2017, Mr. Lee filed a disability discharge application.   However, offsets continued from April 2017 through at least July 3, 2017.

411.    On August 7, 2017, Ms. Carrasquillo filed a disability discharge application.   Her next Social Security payment on September 3, 2017 was offset.

412.    The above decisions of DOE not to suspend offset of the Social Security payments of Plaintiffs Milas, Cort, Liriano, Lee and Carrasquillo were final, non-discretionary decisions that were arbitrary and capricious.

413.    Plaintiffs do not seek damages for these APA violations, but instead a return of taken moneys.

### Fifth Cause of Action

**The DOE's Decisions as to When Ms. Cort was Eligible for a Disability Discharge were Arbitrary and Capricious and in Violation of the Administrative Procedure Act**

**(Plaintiff Cort against Defendant DOE)**

414.    Plaintiff Cort reasserts and realleges the above paragraphs and add the following to assert a violation of the Administrative Procedure Act.

415.    Under 20 U.S.C. § 1087(a), the Secretary of Education must grant a disability-based discharge if a borrower's disability has or is expected to last for more than a continuous 60-month period (five years).

416.    Under 34 C.F.R. § 685.213(b)(2), a borrower can satisfy that standard by providing proof to DOE that SSA has scheduled their medical review for a period within five to seven years.

417.    Sometime shortly after January 11, 2017, Ms. Cort provided DOE a SSA letter in which SSA stated the onset of Ms. Cort's disability was January 1, 2011 and that her next medical

review was September 2018, or more than five years after the date of onset of disability. DOE denied her application on March 21, 2017.

418.    That decision was arbitrary and capricious because it was contrary to the plain requirements of the statute.

419.    As a result of this decision, DOE incorrectly continued to offset Social Security payments of Ms. Cort.

420.    Ms. Cort thereafter reapplied on April 5, 2017 in which she included a statement from SSA that Ms. Cort is on a five year and one month medical review cycle and that her date of disability onset was January 1, 2011 with a date of entitlement of August 1, 2013.   That disability discharge application was approved on May 18, 2017 with an effective date of April 6, 2017, the date DOE received the second application.

421.    As a result of that decision, Ms. Cort was not entitled to a refund of offsets prior to April 6, 2017.

422.    DOE's decision not to find Ms. Cort eligible to a discharge since the date offsets began in late 2016, or at the very latest, the date she first filed for a disability discharge in January 2017, was arbitrary and capricious.

## Sixth Cause of Action

**The failure of SSA, Treasury and DOE to include receipt of Social Security Disability benefits for five consecutive years as a "bypass code" exempting the debt from Treasury offset Violates the Administrative Procedure Act.**

**(Plaintiffs Rodriguez, Roberts, Cort, Lee and Carrasquillo against Defendants SSA Treasury and DOE)**

423.    Plaintiffs Rodriguez, Roberts, Cort, Lee and Carrasquillo reassert and reallege the above paragraphs and add the following to assert a violation of the Administrative Procedure Act.

66

424.     Each month, SSA sends to Treasury's offset unit an electronic file of persons to whom federal payments are due.   This electronic file includes bypass codes that exempt certain Social Security payments from Treasury offset.

425.     SSA knows which Social Security recipients have been disability within the meaning of the Social Security Act for a continuous period of more than five years.

426.     Receipt of Social Security Disability for more than five consecutive years satisfies the statutory standard for a student loan disability discharge.

427.     DOE "shall" discharge loans of borrowers who are permanently disabled.

428.     Plaintiffs Rodriguez, Roberts and Lee had received Social Security Disability payments for more than a decade when SSA sent its electronic file to Treasury's offset unit that Treasury then matched against its debtor data base.

429.     Plaintiff Cort had been adjudicated disabled continuously as of January 1, 2011 when SSA sent its electronic file in late 2016 to Treasury's offset unit that Treasury then matched against its debtor data base.

430.     Plaintiff Carrasquillo had been continuously disabled for five consecutive years in May 2012 when SSA sent its electronic file that month to Treasury's offset unit that Treasury then matched against its debtor data base.

431.     Failure to include a bypass code that would have protected Plaintiffs Rodriguez, Roberts, Cort, Lee and Carrasquillo from offset due to their permanent disabilities was arbitrary and capricious.

**Seventh Cause of Action**

**The failure of SSA, Treasury and DOE to include receipt of Social Security Disability benefits for five consecutive years as a "bypass code" exempting the debt from Treasury offset Violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 et. seq. (Plaintiffs Rodriguez, Roberts, Cort, Lee and Carrasquillo against Defendants DOE, SSA and Treasury)**

432.    Plaintiffs Rodriguez, Roberts, Cort, Lee and Carrasquillo reassert and reallege the above paragraphs and add the following to assert a violation of the Administrative Procedure Act and the Rehabilitation Act.

433.    The above Plaintiffs' disabilities that had lasted more than five consecutive years prevented plaintiffs from accessing the disability discharge program prior to offset.

434.    The above Plaintiffs' disabilities that had lasted for more than five years made navigating the disability discharge requirements more difficult than for persons who had been disabled for less than five years.

435.    Mr. Rodriguez's could not get his VA psychiatrist to complete the disability discharge application for several months because his psychiatric appointments for his life-long, schizo-affective disorder were infrequent.   Mr. Roberts' chronic mental illness rendered him too disorganized to comply with DOE follow-up requests.   Ms. Cort's disabilities were so severe that she could not timely obtain information from SSA required by DOE.

436.    Mr. Lee's disabling condition was principally psychiatric, although he did have some physical impairments.   At the time of offset, Mr. Lee had stopped regular psychiatric treatment given his mental illness and bad experiences with psychiatric hospitals and psychiatric medications.   It took Mr. Lee almost two years to get a psychiatrist to complete the physician disability attestation form because Mr. Lee was fearful of psychiatric treatment and, once his fears

68

were assuaged, needed psychiatric treatment for many months before a psychiatrist could complete the form.

437.    May 2012 was Ms. Carrasquillo's fifth anniversary of the onset of her disability and eligibility for Social Security payments.   However, at the time of her anniversary, Ms. Carrasquillo was preoccupied with her kidney failure that required tri-weekly dialysis.   Hence, her disability prevented her from attending to her financial problems including how to address her student loan offset.

438.    Defendants could have accommodated the plaintiffs by creating a bypass code within SSA's electronic file that ensured SSA recipients with disabilities of more than five years duration did not have their Social Security payments offset for student loan debts.

439.    Such an accommodation would not have fundamentally altered the disability discharge program, but instead would have insured that disabled person with chronic, long term disabilities were not exclude him from obtaining a timely discharge of their student loan debts.

440.    Such an accommodation would not have been an undue burden.


**<u>Eighth Cause of Action</u>**

**The failure of SSA, Treasury and DOE to include a five or more year medical review classification by SSA as a "bypass code" exempting the Social Security payment from Treasury offset Violates Section 504 of the Rehabilitation Act.**

**(Plaintiffs Rodriguez, Cort, Bailey and Lee against all the Defendants)**

441.    Plaintiffs Rodriguez, Cort, Bailey and Lee reassert and reallege the above paragraphs and add the following to assert a violation of the Rehabilitation Act.

442.    Mr. Rodriguez, Ms. Cort, Mr. Bailey, and Mr. Lee qualified for a disability

discharge of their federal student loans by virtue of their medical review classification of more than five years ("permanently impaired") by SSA on March 1, 2011, August or September 2016, February 1, 2016, and July 1, 2014, respectively.

443.    SSA did not include in the bypass field of the monthly electronic file it sent to Treasury's Offset Unit information indicating the payments of each of the above Plaintiffs were exempt from offset by virtue of the permanently impaired disability status given by SSA.

444.    Consequently, Plaintiffs Rodriguez, Cort, Bailey and Lee had to navigate DOE's existing procedures for filing a disability discharge application.

445.    Mr. Rodriguez, Ms. Cort, Mr. Bailey and Mr. Lee all had Social Security Disability payment offsets while SSA had designated them for five or more year medical reviews.

446.    Plaintiffs' severe disabilities that warranted five year or more medical reviews made navigating the disability discharge requirements more difficult than for other borrowers, including Social Security Disability recipients who were given shorter medical review periods by SSA.   Indeed, it took Mr. Bailey more than six weeks to submit the wrong information from SSA regarding his medical review status after DOE advised him of his obligation to do so. Thereafter, it took Mr. Bailey another nine days to get the correct information from SSA once DOE informed him that the earlier information was incorrect.

447.    Mr. Rodriguez and Mr. Lee asked for an accommodation so as to avoid offset based on their disability in late February 2014 and March 2017 when they spoke, respectively, with DOJ's collector and HESC's representative.

448.    While Ms. Cort and Mr. Bailey did not request an accommodation, the need for such an accommodation was reflected in President Obama's March 10, 2015 *Student Aid Bill of*

70

*Rights.* In that Bill of Rights, the White House stated that DOE would work with SSA "to ensure that disability insurance recipients who can discharge their student loans are not instead seeing their disability payments garnished to repay defaulted loans."

449.    Defendants could have accommodated the plaintiffs by creating a bypass code within the electronic file SSA sent to Treasury's offset unit.   The bypass code would have ensured that these three plaintiffs enjoyed one of the benefits of the disability discharge program - protecting their Social Security payments from offset.

450.    Such an accommodation would not have fundamentally altered the disability discharge program, but instead would have insured that a discrete group of borrowers (those with five or more year medical reviews) were not exclude by virtue of their disabilities from obtaining a timely discharge of their student loan debts.

451.    Such an accommodation would not be an undue burden.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Assume jurisdiction over this matter;

2.    Enter a declaratory judgment that Defendants' failure to provide timely and meaningful notice to all the plaintiffs of their right to avoid Social Security offset by applying for a student loan disability discharge violates the due process clause of the Fifth Amendment to the United States Constitution;

3.    Order Defendants to ensure that their offset notices sent in relation to a specific, impending or on-going offset include information prominently featured on the front page in clear,

understandable language about the availability of a disability discharge and contact information for DOE's disability discharge servicer.

4.      Enter a declaratory judgment that Defendant DOE's failure to use the dates that doctors certified Mr. Rodriguez, Mr. Roberts and Mr. Milas as permanently disabled was arbitrary and capricious.

5.      Enter a declaratory judgment that Defendant DOE's decision that Ms. Cort was not eligible for a disability discharge as of her January 2017 application was arbitrary and capricious.

6.      Enter a declaratory judgment that defendant DOE's decision that Ms. Cort was not eligible for a disability discharge prior to the onset of the Social Security offset in late 2016 was arbitrary and capricious and in violation of the rehabilitation act.

7.      Enter a declaratory judgment that Defendant DOE's decision not to suspend offset against Mr. Milas. Ms. Liriano, Ms. Cort, Mr. Bailey, Mr. Lee and Ms. Carrasquillo when DOE learned of their desire to file, or when DOE received, a disability discharge application was arbitrary and capricious.

8.      Enter a declaratory judgment that Defendant DOJ's decision not to suspend offset against Mr. Rodriguez, Mr. Roberts and Ms. Soto when DOJ learned of their desire to file, or when DOE received, a disability discharge application was arbitrary and capricious.

9.      Enter a declaratory judgment against Defendants that they violated Rehabilitation Act by not using bypass codes that ensured Ms. Cort, Mr. Bailey, Mr. Roberts, Mr. Lee, Mr. Rodriguez and Ms. Carrasquillo would timely qualify for the benefits of the DOE's Disability Discharge program and avoid offset in light of their 5 or more year medical review status or their eligibility for SSA disability for five or more consecutive years.

10.     Enter a declaratory judgment that Defendants acted arbitrarily and capriciously by not using the SSA findings of disability eligibility for five years or more, or a five or more year medical review by SSA, as bypass codes that exempts SSA disability payments from offset.

11.     Order Defendants to return all Social Security payments offset from all the plaintiffs.

12.     Order Defendants to return Plaintiff Roberts' tax refund that was intercepted on March 19, 2015.

13.     Enjoin Defendants from engaging in such illegal conduct in the future in the event that the student loan debt of any of the Plaintiffs is reinstated either because a) a Plaintiff failed to comply with DOE's three year reporting requirements, or b) a Plaintiff's disability ceased; or c) a Plaintiff earned more than 100% of the poverty line for a family of two (currently $16,240) during any of the three calendar years following the disability discharge.

14.     Award attorney's fees; and

15.     Award such other and further relief as this Court deems just and proper.


Dated:          September 20, 2017
                Brooklyn, New York



                        By:    _____/s/_____
                               JOHNSON TYLER
                               DANIEL BARKLEY
                               Brooklyn Legal Services
                               105 Court Street
                               Brooklyn, NY 11201
                               Attorneys for Plaintiffs
                               (718) 237-5500

73